**FLORIDA ROCK INDUSTRIES, INC., Plaintiff–Appellee,**

v.

**The UNITED STATES, Defendant– Appellant.**

**No. 91–5156.**

United States Court of Appeals, Federal Circuit.

March 10, 1994.

John A. DeVault, III, Bedell, Dittmar, De-Vault & Pillans, P.A., Jacksonville, FL, argued for plaintiff-appellee. With him on the brief was C. Warren Tripp, Jr., of counsel.

Robert L. Klarquist, Atty., Dept. of Justice, Washington, DC, argued for defendant-appellant. With him on the brief were Barry M. Hartman, Acting Asst. Atty. Gen., Environment & Natural Resources Div., John A. Bryson and Fred R. Disheroon, Attys., Washington, DC. Also on the brief was Roger B. Clegg, Acting Asst. Atty. Gen., Environment & Natural Resources Div., Washington, DC.

Timothy C. Searchinger, Environmental Defense Fund, of New York City, was on the brief for amicus curiae, The Environmental Defense Fund, Inc., The Nat. Wildlife Federation, Inc.

James S. Burling, Ronald A. Zumbrun and Robin L. Rivett, Pacific Legal Foundation, Sacramento, CA, were on the brief for amicus curiae, Pacific Legal Foundation.

Mary V. Dicrescenzo, Nat. Ass'n of Home Builders, Washington, DC, was on the brief for amicus curiae, The Nat. Ass'n of Home Builders, Nat. Ass'n of Realtors, Intern. Council of Shopping Centers, Nat. Ass'n of Indust. and Office Parks, Nat. Realty Committee, Nat. Multi Housing Council and Florida Home Builders Ass'n. With her on the brief was William H. Ethier, Cohn & Birnbaum, Hartford, CT.

George W. Miller, Walter A. Smith, Jr. and Jonathan L. Abram, Washington, DC, were on the brief for amicus curiae, Whitney Benefits, Inc., Peter Kiewit Sons Co.

Before NIES, Chief Judge, NEWMAN and PLAGER, Circuit Judges.

PLAGER, Circuit Judge.

This is a regulatory taking case. It arose when the plaintiff Florida Rock Industries Inc. (Florida Rock) sought a permit under § 404 of the Clean Water Act [1] from the Army Corps of Engineers (Corps) to mine the limestone which lay beneath a tract of wetlands. The Corps denied the permit on October 5, 1980. On May 25, 1982, Florida Rock filed suit in the United States Court of Federal Claims,[2] seeking monetary compensation from the defendant United States (Government); Florida Rock alleged that the Corps' permit denial constituted an uncompensated taking of private property for public use in violation of the Fifth Amendment.[3] The Court of Federal Claims agreed, *Florida Rock Indus., Inc. v. United States*, 8 Cl.Ct. 160 (1985) (*Florida Rock I*), and awarded Florida Rock $1,029,000 plus attorney fees and simple interest. On appeal, this court vacated the judgment that a taking had occurred and remanded for further consideration. *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893 (Fed.Cir.1986), *cert. denied* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987) (*Florida Rock II*). On remand, the Court of Federal Claims found that the permit denial deprived Florida Rock of all value in its land, and so again concluded that there had been a taking and reinstated the $1,029,000 damages award, this time with compound interest. *Florida Rock Indus., Inc. v. United States*, 21 Cl.Ct. 161 (1990) (*Florida Rock III*). The Government appeals both the damages award and the choice of compound rather than simple interest. We again find it necessary to vacate the judgment that there has been a taking, and remand for further consideration consistent with this opinion.

## BACKGROUND

The detailed background of the case is described in the several opinions referred to above as *Florida Rock I–III*. We provide here only a brief overview before proceeding to the heart of the matter: whether the Corps' denial of the § 404 permit effected a regulatory taking, thus requiring the Government to pay just compensation. The answer to that question depends on the impact the regulatory imposition had on the economic use, and hence value, of the property.

In 1972, shortly before the enactment of the Clean Water Act, Florida Rock purchased a 1,560 acre wetlands parcel in Dade County, Florida, to the west of suburban Miami. The purchase price was $2,964,000 (an average of $1,900 per acre).[4] Florida Rock obtained the parcel in order to extract the underlying limestone—a process which destroys the surface wetlands.

During the 1970s, however, the ecological importance of wetlands was increasingly appreciated. The Corps in 1977 enacted regulations requiring owners of wetlands parcels to obtain permits under § 404 of the Clean Water Act before engaging in dredging or filling activities. *See generally United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 123–24, 106 S.Ct. 455, 457, 88 L.Ed.2d 419 (1985). Not long after, Florida Rock began mining operations on the parcel, without having applied for a § 404 permit. The Corps issued a cease and desist order on September 7, 1978. Florida Rock stopped mining, restored the area as best it could, and began negotiating with the Corps for the permit.

Initially, Florida Rock sought a permit for the entire 1,560 acres. The Corps responded

---

1. Pub.L. No. 92–500 § 2, 86 Stat. 884 (Oct. 18, 1972), amending the Federal Water Pollution Control Act (codified as amended at 33 U.S.C. § 1344 (1988)).

2. The Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902, 106 Stat. 4506 (1992), changed the name of the United States Claims Court to the United States Court of Federal Claims.

3. U.S. CONST. amend. V, cl. 4.

4. The average per acre prices, calculated on the overall value of the 1,560 acre parcel, are provided here only to permit rough comparison with other figures in the record for the 98 acre parcel at issue. The per acre value of the 98 acre parcel may differ significantly from the per acre value of the 1,560 acre tract; testimony in the record indicates that the market value of the land is highly dependent on the size of the parcel offered (the larger the parcel, the lower the per acre price), and on the location of the parcel relative to the existing roads.

that permits would be issued only for parcels of a size to suffice for three years of mining; in Florida Rock's case, 98 acres would serve its anticipated needs for three years. Florida Rock acquiesced in the Corps' demand and applied for a permit covering only the 98 acre parcel at issue here. After considering the revised application, the Corps concluded that the proposed mining would cause irremediable loss of an ecologically valuable wetland parcel and would create undesirable water turbidity. The permit application was denied on October 2, 1980.

Florida Rock, conceding the validity of the Corps' actions,[5] filed suit in the United States Court of Federal Claims, alleging that the permit denial was an uncompensated regulatory taking of its land. In *Florida Rock I*, the Court of Federal Claims found that the value of the parcel before the taking was $10,500 per acre and that the value after the taking was negligible because rock mining—in the view of the court, the *only* viable economic use—had been foreclosed. *Florida Rock I*, 8 Cl.Ct. at 164 (citing *Hodel v. Virginia Surface Mining and Reclamation Ass'n*, 452 U.S. 264, 295–96, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981)). The Court of Federal Claims concluded that the permit denial was a regulatory taking, for which the landowner must be compensated. *Florida Rock I*, 8 Cl.Ct. at 165.

On appeal to this court, that judgment was vacated in *Florida Rock II*. The Federal Circuit held that the Court of Federal Claims in determining the after-taking value of the affected property had erred in focusing on *immediate* use—the proper focus should instead have been on a determination of "fair

market value." *Id.*, 791 F.2d at 903. The case was remanded to the Court of Federal Claims for further proceedings.

On remand, the Court of Federal Claims entertained evidence seeking to establish the fair market value of the property subsequent to the permit denial. The Government presented two assessors, Mr. Slack and Mr. Cantwell, who had investigated contemporaneous land sales in the area. Using the standard comparable sales valuation method, one assessor concluded that the property had a fair market value of $4,000 per acre, while the other found a value of $4,615 per acre. In addition, Florida Rock had received actual purchase offers in the range of $4,000 per acre. The President of Florida Rock Industries, Mr. Edward Baker, testified that he believed the property to be worth $10,000 per acre, even *after* the Corps' permit denial (thus presumably explaining why all such purchase offers were declined).

Finally, the Government presented a state court opinion which had affirmed the state's tax assessment of $4,089,950 for the 1,560 acre parcel, based on comparable sales of nearby parcels during the 1979–1982 time period. (This assessment figure for the larger parcel reflects an average value of $2,621.76 per acre; *see supra* note 3.) *Florida Rock Indus., Inc., v. Bystrom*, 485 So.2d 442, 444–45 (Fla.App.1986), *review denied*, 492 So.2d 1332 (1986) (*Bystrom*). That assessment was based on comparable sales which presumably reflected the market's evaluation of present and future land use restrictions. *Id.* at 444 and 447.[6]

Florida Rock, on the other hand, read *Florida Rock II* to require a detailed inquiry

---

**5.** Florida Rock chose not to avail itself of the mechanism provided by the Administrative Procedure Act, 5 U.S.C. § 706 (1988), for challenging in District Court the validity of the Corps' refusal to entertain an application for the entire 1,560 acre parcel and subsequent denial of the permit application for the 98 acre parcel.

**6.** The admissibility and significance of this state court decision was a matter of heated dispute between the parties, both at trial and on appeal. The Government argued that, under the doctrine of nonmutual defensive collateral estoppel (citing *United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984)), *Bystrom* was conclusive on the question of the fair market value of the property, and, given the value of the property

thus established, there could be no taking. Florida Rock argued that the Court of Federal Claims was not bound by holdings in a state tax assessment case, and that the general rule that property tax assessments are not admissible as evidence of fair market value in a condemnation proceeding (citing *Miller v. United States*, 223 Ct.Cl. 352, 620 F.2d 812 (Ct.Cl.1980)) was fully applicable. The trial judge agreed with Florida Rock, and concluded that, since valuation for purposes of state taxation and valuation for purposes of determining a taking under the Fifth Amendment are not identical issues, the court was not bound by the *Bystrom* court's findings on that issue.

We find no error in the trial judge's conclusion that the value placed on the property in the tax case should not be determinative of the fair mar-

into the motivations and sophistication of buyers of the comparable properties upon which assessment was based. It crafted a survey—viewed by the Court of Federal Claims to be "admittedly novel," *Florida Rock III*, 21 Cl.Ct. at 173—and concluded that virtually all the buyers of the comparable properties were lacking in sufficient knowledge in order for their purchases to qualify as truly comparable sales. Florida Rock's assessor, Mr. Failla, used the results of this survey to justify discarding evidence that the average retail price of parcels in the vicinity of Florida Rock's land was $6,100 per acre, and concluded that the actual fair market value of the tract following the permit denial was negligible. Implicit in this result is the assumption that no one with full knowledge of the regulatory regime would be willing to gamble that concern for the ecological importance of the wetlands would give way in the future to the economics of development pressure from nearby Miami. The Court of Federal Claims in *Florida Rock III* agreed with Florida Rock's view of the matter, and decided accordingly.

## DISCUSSION

### A.

■ How to determine whether a regulatory taking under the Fifth Amendment has

occurred is a subject of on-going debate.[7] The Supreme Court has provided various articulations, influenced, as could be expected, by the particular circumstances of the cases before it. One formula that has emerged and has been repeated in several cases requires that the court balance several pragmatic considerations in making its regulatory takings determination. These considerations include: the economic impact of the regulation on the claimant, the extent to which the regulation interferes with investment-backed expectations, and the character of the Government action. (The leading case is *Penn. Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (*Penn Central*)). In this appeal, it is the economic impact of the regulation that is at issue.[8]

■ The recent Supreme Court decision in *Lucas v. South Carolina Coastal Council*, 505 U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (*Lucas*), teaches that the economic impact factor alone may be determinative; in some circumstances, no balancing of factors is required. If a regulation categorically prohibits *all* economically beneficial use of land—destroying its economic value for private ownership—the regulation has an effect

ket value for takings purposes. As we explain below, it is not the tax assessor's valuation which is at issue here, but whether there was a market from which a fair value could be established. At the very least, however, this judicial proceeding provides a thorough review of several real estate assessors' analyses of the fair market value at the relevant time, and provides the Court of Federal Claims with a judicial determination based on a high degree of familiarity with the Florida real estate market. As such, it is admissible and persuasive in support of the Government's argument that the 98 acre parcel retained more than nominal fair market value after denial of the permit.

7. The literature is extensive; readers conversant with the field will be familiar with much of it. Among symposia and significant individual contributions in the last year are: Richard Ausness, *Wild Dunes and Serbonian Bogs: The Impact of the Lucas Decision on Shoreline Protection Programs* 70 Denv.U.L.Rev. 437 (1993); *Catholic University Law Review: United States Court of Federal Claims Symposium*, Cath.U.L.Rev. 717 (contributions by James E. Brookshire, Dennis J. Coyle, John A. Humbach, Glynn S. Lunney, Jr., George W. Miller & Jonathan Abram, and Loren

A. Smith) (1993); David Mandelker, *Of Mice and Missiles: A True Account of Lucas v. South Carolina Coastal Council*, 8 J. Land Use & Envtl. L. 285 (1993). *Northwestern School of Law of Lewis and Clark College: A Colloquium on Lucas*, 23 Envtl. L. 869 (contributions by Michael C. Blumm, William Funk, James L. Huffman, Donald Large, Edward Sullivan, and Lawrence Watters) (1993); Jed Rubenfeld, *Usings*, 102 Yale L.J. 1077 (1993); *Stanford Law Review: Symposium on Lucas v. South Carolina Coastal Council*, 45 Stan.L.Rev. 1369 (contributions by Richard Epstein, William W. Fisher, Richard Lazarus, and Joseph L. Sax) (1993); *Windfalls and Wipeouts: Environmental Regulation, Property, and the 'Takings' Clause after Lucas v. South Carolina Coastal Council*, 17 Vt.L.Rev. 645 (1993); Walker, *Common Law Rules and Land Use Regulations: Lucas and Future Takings Jurisprudence*, 3 Seton Hall Const.L.J. 3 (1993).

8. For a discussion of the various formulas, and a consideration of the mix of 'categorical' or 'per se' rules and 'balancing' rules, *see* Mandelker, *supra* n. 7.

equivalent to a permanent physical occupation.[9] There is, without more, a compensable taking.[10]

If, however, a regulation prohibits less than all economically beneficial use of the land and causes at most a partial destruction of its value, the case does not come within the Supreme Court's 'categorical' taking rule. As we explain below, we reject the trial court's analysis that led to its conclusion that all economically beneficial use of the land was taken by the Government. We remand for determination of what economic use as measured by market value, if any, remained after the permit denial, and for consideration of whether, in light of the properly assessed value of the land, Florida Rock has a valid takings claim.

### B.

 In *Florida Rock II* this court stated that, with regard to the property at issue, although "there may be a question what knowledgeable buyers would have paid, but that they would have paid some substantial figure seems certain." *Id.*, 791 F.2d 893 at 903. The trial court on remand was instructed: "if there is found to exist a solid and adequate fair market value (for the 98 acres) which Florida Rock could have obtained from others for that property, that would be a sufficient remaining use of the property to forestall a determination that a taking had occurred or that any just compensation had to be paid by the government." *Id.* We did not discuss what residual fair market value would be "adequate" to forestall a taking determination.

We did explicitly indicate that the Court of Federal Claims should give consideration to "a relevant market made up of investors who are real but are *speculating* in whole or major part." *Florida Rock II*, 791 F.2d at

903 (citing *Bystrom*, 485 So.2d at 447; emphasis added). The court noted the testimony of the Government's assessor, Mr. Cantwell, and said:

> We are of the opinion that Mr. Cantwell's testimony, if considered and believed, established the existence of a market in which Florida Rock could have disposed of the property and mitigated the severity of the regulatory action here involved.

*Id.* And while the court stated that "we take it for granted, as Mr. Cantwell did, that the 'willing buyer' of the market value formula has got to be one who is correctly informed about the physical character of the land, as well as legal restrictions on its use . . ." *id.* at 902, we also indicated that the market as a whole was not dominated by persons engaged in fraudulent or illegal behavior:

> Since the tract was not listed for sale, the $4,000 per acre offer, the frequent inquiries, and the assessed value, must have reflected interest of knowledgeable people, not foreigners or gulls.[11]

*Id.* In short, we understand *Florida Rock II* to hold that purchases which are made by market speculators as well as home builders and other developers are comparable sales, with the caveat that particular sales might be discarded by the assessor if those sales appear questionable in light of the market as a whole.

Florida Rock, and the Court of Federal Claims on remand in *Florida Rock III*, read *Florida Rock II* differently. Our passing reference to buyers being "correctly informed" was read to require a detailed inquiry into the motivation and sophistication of the buyers whose purchases comprised the comparable sales used in the fair market value assessment. The Court of Federal Claims rejected the testimony of Mr. Cantwell—the same testimony which we had not-

---

**9.** *See Hendler v. United States*, 952 F.2d 1364 (1991), for a discussion of the legal and historical interplay between physical and regulatory takings.

**10.** *Lucas*, however, gives the government a defense based on nuisance limitations that inhere in the owner's title. 505 U.S. ——, at ——, 112 S.Ct. 2886, at 2900. A nuisance defense, by definition, incorporates a degree of balancing.

**11.** Since state law generally does not preclude foreigners from owning land, and since there is no established meaning to the term 'gulls' (other than among ornithologists), we understand this reference to be to the law governing fraudulent and illegal land sales and to persons generally protected by that law.

ed with approval in *Florida Rock II*—solely because Mr. Cantwell, with little exception, assumed sufficient knowledge on the part of the purchasers. *Florida Rock II*, 21 Cl.Ct. at 172. Instead, the court accepted the testimony of Florida Rock's assessor, who rejected *all* of the comparable sales values on the principle that none of the purchasers were sufficiently sophisticated and knowledgeable. That was error—contrary to our instruction in *Florida Rock II*, contrary to generally accepted understandings of market valuation, and finally, contrary to the working assumptions of a free market.[12]

There is no disagreement as to the facts regarding the existence and nature of the market. Florida Rock's study identified in the immediate vicinity of the 98 acre tract 240 land sales during the period . 1971 through 1987. A significant number of those sales occurred in the early 1980s, despite the intervening change in the regulatory environment. The average sales price per acre in 1980 was $6,100. The price per acre varied predominantly as a function of the overall lot size; smaller lots commanded higher per acre prices. Florida Rock's survey indicated that roughly 80% of the buyers had purchased the land for 'investment' purposes and that, overall, the purchasers intended to hold the land for an average of 9 to 10 years.

Thus, there was an active though speculative investment market for Florida Rock's land at the time of and following the permit denial. *Accord, Bystrom,* 485 So.2d at 447–48. The fair market price which Florida Rock could have commanded at that time remains, still, to be determined, but it was certainly much higher than the nominal $500 per acre value accepted by the Court of Federal Claims.

Florida. Rock's survey does indicate that most of the buyers in this market did not have extensive knowledge of the provisions of the Clean Water Act and its impact on the development potential of those properties involving wetlands. It is doubtful that any legal conclusions should be drawn from this. Such broad-based disregard for current land use regulations suggests that, while parties contract in the shadow of the law, long term market trends in real estate values are not necessarily correlated to Government controls. The Government's appraisers testified that detailed knowledge of regulatory constraints was relevant only when the goal of the purchasers was *immediate* development. And as Mr. Slack testified, "there was not really a demand for property this far out [from Miami] at this time. People were not buying it to do anything with it right then anyway."

A speculative market may exist in land that is regulated as well as in land that is not, and the precise content of regulations at any given time may not be particularly important to those active in the market. As this court observed in *Florida Rock II*, 791 F.2d 893 at 902–03, yesterday's Everglades swamp to be drained as a mosquito haven is today's wetland to be preserved for *wildlife* and aquifer recharge;[13] who knows what tomorrow's view of public policy will bring, or how the market will respond to it.

---

**12.** The Court of Federal Claims acknowledged that "[u]sually, it may be adequate to presume all knowledge of legal restrictions on the part of purchasers in arms-length transactions." *Florida Rock III*, 21 Cl.Ct. at 173. We agree; *Florida Rock II* did not require more. It is true that there is a statement in *Florida Rock II*—that a willing buyer is one who is 'correctly informed' about the legal restrictions on the use of the land—that, taken in isolation and as a blanket requirement, is not a correct statement of law. The market from which a fair market value may be ascertained need not contain only legally trained (or advised) persons who fully investigate current land use regulations; ignorance of the law is every buyer's right. It is also true that it was this statement that gave Florida Rock's lawyers a crack through which they attempted to drive their novel approach to what constitutes a fair market. And it was the trial judge's acceptance of this approach that requires today's reversal. When read as a whole, however, the opinion in *Florida Rock II* does not support such a novel approach to the well-established concept of a willing buyer. The opinion clearly focussed the issue on the central question: the fair market value before and after the imposition of the regulatory restraint, and the extent of change, if any.

**13.** *See* F.E. Maloney, S.J. Plager, and F.N. Baldwin, *Water Law and Administration—The Florida Experience* 141–45 (1968) for a discussion of the hydrologic cycle and the inter-relationship between wetlands and the recharge of ground water acquifers, the major source of public water supplies in Florida.

We need not decide such speculative questions here. The uncontroverted evidence of an active real estate market compels the conclusion that the typical 'willing buyer-willing seller' requirement of fair market value had been met; it would be inappropriate for a court to substitute its own judgment of value for that of the market. While an assessor might be justified in adjusting the fair market value figure by discarding aberrational values based upon sales between related entities or fraudulent sales to widows and orphans, an assessor may not discard an *entire* market as aberrational.[14] 'Aberrational' means outside the norm established by general activity. The fact that many players in the market chose to disregard the immediate potential for development in favor of a long-term perspective—hardly unusual behavior in Florida's history of real estate investment—does not make the market as a whole 'aberrational.' When the market provides a well-substantiated value for a property, a court may not substitute its own judgment as to what is a wise investment.

It was error to read *Florida Rock II* as requiring a detailed inquiry into the motivation and sophistication of the buyers of comparable parcels. Dollars are fungible; a speculative market provides a landowner with monetary compensation which is just as satisfactory as that provided by any other market. Should a landowner wish to pick and choose her buyers, that luxury is not chargeable to the federal fisc. To conclude otherwise would be tantamount to concluding that there could never be a market fueled by speculation—a conclusion at odds both with common sense and with our directions in *Florida Rock II.*

### C.

Ultimately, the question that must be answered is whether, as a result of the denial of certain economic uses, there was a taking of Florida Rock's property by the Government. This question turns on "the economic impact of the regulation on the claimant," *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659, measured by the change, if any, in the fair market value caused by the regulatory imposition. On the state of the record before us we are unable to answer the question. The Court of Federal Claims answered it with a straightforward 'yes' when the per acre value of the 98 acre parcel after the permit denial was found to be only a nominal $500 per acre, as compared to the $10,500 found by the trial court to be the per acre value prior to the permit denial. This represented a loss in value of roughly 95%. *Florida Rock III,* 21 Cl.Ct. at 175. The court in effect treated the permit denial as essentially a 'categorical' taking of all economic use. *See Lucas,* 505 U.S. at ——, 112 S.Ct. at 2893. "The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land." *Id.*

The Court of Federal Claims' analysis was correct in theory, but started from an incorrect premise—that the value of the parcel after denial of the permit was a nominal $500 per acre. When a figure closer to $4,000 per acre is substituted, the correct outcome is no longer clear. On remand, with a fair market value calculated in accordance with this opinion, the Court of Federal Claims must again return to the approach dictated by *Florida Rock II:*

> [T]he court should consider, along with other relevant matters, the relationship of the owner's basis or investment, and the fair market value before the alleged taking to the fair market value after the alleged taking. In determining the severity of the economic impact, the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored.

*Id.,* 791 F.2d at 905.

The Court of Federal Claims must reconsider the assessments proffered by the par-

---

**14.** Florida Rock did not introduce evidence that the market was comprised of illegal or fraudulent sales. However, Florida Rock cites *Johnson v. Davis,* 480 So.2d 625 (Fla.1985), to support their argument that the parcel could not have been sold without committing fraud. *Johnson,* which issued several years after the permit denial, involved defects in the roof of a home which were known to the seller but not disclosed to the buyer; the holding of that case appears to be limited to material facts "which are not readily observable and not known to the buyer." *Id.* at 629. That is quite a different matter from legal restrictions on the subsequent use of the property which are necessarily part of the public record and ascertainable from it.

ties and other evidence in the record, and determine a fair market value accordingly.[15] Should that determination establish, as the evidence in the record suggests, that there was *some* (but not a total) reduction in the overall market value of plaintiff's property as a result of the regulatory imposition, the question will then be posed: does that reduction constitute a taking of property compensable under the Fifth Amendment? [16]

■ To answer this question requires the court to resolve two preliminary issues. The first is whether a regulation must destroy a certain proportion of a property's economic use or value in order for a compensable taking of property to occur. The second is how to determine, in any given case, what that proportion is.

Since the Supreme Court's decision in *Pennsylvania Coal v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (*Pennsylvania Coal*), the problem for courts has been to determine the extent to which the Fifth Amendment burdens the exercise of the police power through regulation,[17] that is, to determine when a particular regulation somehow—in the words of Justice Holmes—goes "too far," *id.* at 415, 43 S.Ct. at 160, and therefore effects a taking.[18] It is now clear that a regulation that constitutes a total deprivation of economically beneficial use goes "too far;" such a regulatory imposition re-

sults in a 'categorical' taking similar to a physical taking of property.[19] *Lucas,* 505 U.S. ——, 112 S.Ct. 2886.

■ The question remains, does a partial deprivation resulting from a regulatory imposition, that is, a situation in which a regulation deprives the owner of a substantial part but not essentially all of the economic use or value of the property, constitute a partial taking, and is it compensable as such? This question has been much debated in the literature since the Supreme Court's decision announcing that as a general proposition regulatory takings are compensable; the Court's decisions to date have not provided an answer.[20]

Nothing in the language of the Fifth Amendment compels a court to find a taking *only* when the Government divests the total ownership of the property; the Fifth Amendment prohibits the uncompensated taking of private property without reference to the owner's remaining property interests. In *Lucas,* the Supreme Court touched upon the question of a partial regulatory taking, *see* 112 S.Ct. 2893–95, but, concluding on the facts before it that the case was one in which the owner was called upon "to sacrifice all economically beneficial uses in the name of the common good," *id.* at ——, 112 S.Ct. at 2895, the Court found a categorical taking and thus did not have to decide the partial

**15.** We do not by this intend to preclude the taking of additional evidence; that is a matter within the discretion of the Court of Federal Claims.

**16.** Because the issue on appeal is the determination of the value of the property as a whole before and after the regulatory imposition, this case does not present the additional difficulties created by parcelling the property interests affected. *Compare Lucas,* 505 U.S. at ——, 112 S.Ct. 2886 at n. 7 with *Penn Central,* 438 U.S. 104 at 130, 98 S.Ct. 2646, at 2662.

**17.** The term "police power" is used herein to refer to the power of the federal government to engage in activities not unlike those engaged in by the states under their inherent sovereign powers, recognizing that the power in the federal system is of Constitutional origin.

**18.** It should be clear that the question in cases such as this is not whether the Government has

power to regulate the development of wetlands. While challenges to the Government's power to act through its various agencies are judicially reviewable, *see* 5 U.S.C. § 701 *et seq.,* the Administrative Procedure Act, the question of power to act is not before us. The only question here is, when the Government chooses to act in the manner it did, must it pay the just compensation mandated by the Fifth Amendment.

**19.** There is a limited governmental defense to a 'categorical' taking; see note 10, *supra,* and accompanying discussion.

**20.** *Lucas,* 505 U.S. ——, n. 7, 112 S.Ct. 2886, n. 7 and accompanying text. For recent academic discussion of the problems of partial regulatory takings, *see* Richard A. Epstein, *Lucas v. South Carolina Coastal Council: A Tangled Web of Expectations, supra* n. 7 (45 Stan.L.Rev. 1369, 1375, 1387–1392, (1993)); Rubenfeld, *supra* n. 7, Part V, Subpart E, "Parceling and Partial Usings."

taking question.[21] *Id.* at —— n. 9, 112 S.Ct. at 2896 n. 9.

Justice Stevens, writing separately, criticized as arbitrary the notion that "[a] landowner whose property is diminished in value 95% recovers nothing, while an owner whose property is diminished 100% recovers the land's full value." *Id.* at ——, 112 S.Ct. at 2919, Stevens, *dissenting*. In response, Justice Scalia, writing for the Court, noted that Justice Stevens's analysis "errs in its assumption that the landowner whose deprivation is one step short of complete is not entitled to compensation." *Id.* at ——, 112 S.Ct. at 2894 n. 8.[22]

No such conceptual problem seems to exist when the taking is by physical occupation. If a property owner owns a 100 acre tract, and the Government takes 95 acres for a public park, no one would argue that the five acres remaining somehow precludes the property owner from claiming entitlement to just compensation for the loss of the 95. Indeed, if the Government took just 5 acres and left the property owner with 95, there would be no question that the owner was entitled to compensation for the parcel taken (plus severance damages attributable to the remaining tract).[23]

Courts have held that even relatively minor physical occupations are compensable. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Hendler v. United States*, 952 F.2d 1364 (Fed.Cir.1991). Logi-

cally, the amount of just compensation should be proportional to the value of the interest taken as compared to the total value of the property, up to and including total deprivation, whether the taking is by physical occupation for the public to use as a park, or by regulatory imposition to preserve the property as a wetland so that it may be used by the public for ground water recharge and other ecological purposes.[24]

The felt need for some kind of a special rule in regulatory takings cases may stem from the difficult line that has to be drawn between a partial regulatory taking and the mere 'diminution in value' that often accompanies otherwise valid regulatory impositions. As expressed by Justice Holmes in *Pennsylvania Coal,* "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone." *Id.,* 260 U.S. at 413, 43 S.Ct. at 159. Gone as well, it is almost superfluous to add, would be the constraints imposed on the Government by the takings clause.

One way to avoid this linedrawing problem would be to declare that no regulatory taking is compensable under the Fifth Amendment; the only available remedy for a regulation that goes 'too far' is invalidation of the impo-

---

**21.** Similarly, in *Whitney Benefits, Inc. v. U.S.,* 926 F.2d 1169 (Fed.Cir.1991), this court held that the impact of the Surface Mining Control and Reclamation Act of 1977 on plaintiff was a total destruction of all economically viable use; the Government's arguments regarding possible alternative uses, such as farming, were considered "completely off the mark." *Id.,* at 1174.

**22.** In addition to the analytical discontinuities that are created by such an all-or-nothing rule, there are practical difficulties as well. *See* Epstein, *supra* n. 14.

**23.** See, e.g., A.V. Kendall & S.J. Plager, *Severance Damage in Eminent Domain Proceedings,* 10 U.Fla.L.Rev. 1 (1957).

**24.** Dissenting in *San Diego Gas & Electric Co. v. San Diego,* 450 U.S. 621, 652, 101 S.Ct. 1287,

1304, 67 L.Ed.2d 551 (1980), Justice Brennan wrote:

> Police power regulations such as zoning ordinances and other land-use restrictions can destroy the use and enjoyment of property in order to promote the public good just as effectively as formal condemnation or physical invasion of property. From the property owner's point of view, it may matter little whether his land is condemned or flooded, or whether it is restricted by regulation to use in its natural state, if the effect in both cases is to deprive him of all beneficial use of it. From the government's point of view, the benefits flowing to the public from preservation of open space through regulation may be equally great as from creating a wildlife refuge through formal condemnation or increasing electricity production through a dam project that floods private property.

sition. That was the historic practice in the courts for much of the twentieth century, but the Supreme Court definitively rejected that practice in *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). The Fifth Amendment "is designed 'not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.'" *Preseault v. ICC*, 494 U.S. 1, 11, 110 S.Ct. 914, 921, 108 L.Ed.2d 1 (1990) (quoting *First English*, 482 U.S. at 315, 107 S.Ct. at 2385; emphasis in both cases).[25] Nothing in the Fifth Amendment limits its protection to only 'categorical' regulatory takings, nor has the Supreme Court or this court so held.[26] Thus there remains in cases such as this the difficult task of resolving when a partial loss of economic use of the property has crossed the line from a noncompensable 'mere diminution' to a compensable 'partial taking.'

The trial court will find itself with little direct case law guidance. As *Pennsylvania Coal* and subsequent appellate court decisions have recognized, the question of when a regulatory taking occurs cannot be answered as a matter of absolute doctrine, but instead requires case by case adjudication: "the question depends upon the particular facts." *Id.*, 260 U.S. 393 at 413, 43 S.Ct. at 158 at

159. *See also, inter alia, United States v. Caltex*, 344 U.S. 149, 156, 73 S.Ct. 200, 203, 97 L.Ed. 157 (1952); *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958); *Penn Central* 438 U.S. 104 at 124, 98 S.Ct. 2646 at 2659, noting the "essentially ad hoc, factual inquiries" in takings jurisprudence. But recourse to the facts hardly solves the basic problem at hand—there simply is no bright line dividing compensable from noncompensable exercises of the Government's power when a regulatory imposition causes a partial loss to the property owner. What is necessary is a classic exercise of judicial balancing of competing values.[27]

When there is reciprocity of advantage, paradigmatically in a zoning case, *see, e.g., Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), then the claim that the Government has taken private property has little force: the claimant has in a sense been compensated by the public program "adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659. Thus shared economic impacts resulting from certain types of land use controls have been held to be non-compensable. *Agins v. Tiburon*, 447 U.S. 255, 262–63, 100 S.Ct. 2138, 2143, 65 L.Ed.2d 106

---

**25.** We note in passing that in both *First English* and *Preseault* the Supreme Court applied the takings clause to property interests less compendious than a fee simple. *First English* concerned a temporary prohibition on the use of land in a floodplain. The Supreme Court did not hold, as the dissent would have us today, that the Government's temporary taking required that the Government purchase the fee. Instead, the Supreme Court held that the Fifth Amendment required compensation for what was taken, *viz.* the use of the petitioner's land for a limited period of time. *Preseault* involved a reverter on an easement. The Supreme Court held that the takings challenge was premature because the petitioner had not brought a claim under the Tucker Act in the Court of Federal Claims. The Supreme Court was not concerned that the interest with which the Government had allegedly interfered was a contingent future interest.

**26.** In *Yancey v. United States*, 915 F.2d 1534 (Fed.Cir.1990), a federal government quarantine to control avian influenza had caused the owner of a flock of healthy breeder turkeys to market them for slaughter. The resulting loss to the

owner was approximately 75% of the breeder flock's value. This court found a compensable taking.

**27.** *See Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) ("The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest."); *First Lutheran Church v. Los Angeles County*, 482 U.S. 304, 318–319, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987) ("It is axiomatic that the Fifth Amendment's just compensation provision is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'") (citing *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)); *Penn Central*, 438 U.S. 104 at 125, 98 S.Ct. 2646 at 2659 ("the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations" in takings analysis).

(1980) (shared 'benefits and burdens' of a zoning ordinance); *Penn Central*, 438 U.S. 104 at 131, 98 S.Ct. 2646 at 2662 (same).

That the purpose and function of the regulatory imposition is relevant to drawing the line between mere diminution and partial taking should not be read to suggest that when Government acts in pursuit of an important public purpose, its actions are excused from liability. To so hold would eviscerate the plain language of the Takings Clause, and would be inconsistent with Supreme Court guidance.[28] It is necessary that the Government act in a good cause, but it is not sufficient. The takings clause already assumes the Government is acting in the public interest: "nor shall private property be taken *for public use* without just compensation" (emphasis added).

It is for the trial court as an initial matter to determine whether the Government acted within its proper role in the circumstances presented by the case of *Florida Rock*. Marketplace decisions should be made under the working assumption that the Government will neither prejudice private citizens, unfairly shifting the burden of a public good onto a few people, nor act arbitrarily or capriciously, that is, will not act to disappoint reasonable investment-backed expectations. The Government, in a word, must act fairly and reasonably, so that private parties can pursue their interests. At the same time, when Government acts as the intermediary between private interests to provide a mutually beneficial environment from which all benefit and in which all can thrive, the shared diminution of free choice that results may not rise to the level of constitutionally required compensation.

In addition, then, to a demonstration of loss of economic use to the property owner as a result of the regulatory imposition—a fact yet to be properly determined in this case—the trial court must consider: are there direct compensating benefits accruing to the property, and others similarly situated, flowing from the regulatory environment? Or are benefits, if any, general and widely shared through the community and the society, while the costs are focused on a few? Are alternative permitted activities economically realistic in light of the setting and circumstances, and are they realistically available? In short, has the Government acted in a responsible way, limiting the constraints on property ownership to those necessary to achieve the public purpose, and not allocating to some number of individuals, less than all, a burden that should be borne by all?

Admittedly this is not a bright line, simply drawn. Property owners and regulators, attempting to predict whether a governmental regulation has gone too far, will still need to use judgment and exercise care in making decisions. In this sense our decision today continues the tradition of *ad hoc* judicial decisionmaking in this area. Over time, however, enough cases will be decided with sufficient care and clarity that the line will more clearly emerge.

The dissent rejects drawing the line between non-compensable 'mere diminution' land use regulatory restraints and compensable takings of property interests that involve less than all of the fee estate. The dissent favors an all or nothing approach—if some critical threshold of value loss is reached as a result of the regulatory imposition, then the property owner is entitled to compensation for the taking of the entire fee. This is, of course, another way to handle the problem of partial takings, but there are serious problems with the dissent's approach.

If the dissent's approach provided a bright line and avoided the *ad hocery* problem, that might argue in its favor. But it does not. Determining the threshold in any given case which, under the dissent's view would trigger full compensation, requires the same sort of weighing and balancing of indeterminate factors. Furthermore, the dissent endorses the questionable policy of forcing the Government to pay for something it does not want and has not taken. The dissent's approach requires the Government to pay for the 'fee' in the land—i.e., the entire bundle of

---

**28.** In *Lucas,* the South Carolina Supreme Court had held that the State's purpose in protecting oceanfront ecology excused the State from liability for its regulatory imposition. The Supreme Court held that was not the correct criterion for takings jurisprudence. *Lucas,* 505 U.S. ——, 112 S.Ct. 2886.

rights—even though the Government may be seeking only to restrict certain kinds of development or certain uses. This has the potential of unfairness to both the Government and the property owner. The latter may wish to be paid for what she has lost but keep the rest; and the Government should not be put to the obligation of paying for more than it wants when it does not set out to take it.[29] The property owner is entitled to just compensation for what is taken, no less, but no more.[30]

The dissent is concerned that what is being taken is 'value,' not property.[31] In fact, in a regulatory context such as this it is both. By taking some portion of Florida Rock's economic use of the property—its power to disturb the overlying wetlands, and with it the common law property right to mine its subsurface minerals—the Government appears to have destroyed part of the value of Florida Rock's holdings. If that proves to be the case, and if the application of the *ad hoc* tests previously described so warrant, the property interest taken belongs to the Government, and the right to just compensation for the interest taken belongs to Florida Rock.[32]

The Supreme Court did not have any difficulty in finding that a property interest was taken when the Government authorized the installation of a small cable box on an apartment building; the Government was not required to buy the building. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). Nor was there any difficulty in finding a property interest taken—if it needs a label, call it a limited co-tenancy with an easement for access—when the Government sank wells on an owner's property and periodically entered to service the wells and to make tests of the water. *Hendler v. United States*, 952 F.2d 1364 (Fed.Cir.1991). The fact that the source of any particular taking is a regulation rather than a physical entry should make no difference—the nature of legal interests defining the property affected remains unchanged.

Finally, the dissent believes that Supreme Court precedent establishes that a Fifth Amendment claim that specific property has been taken is an all or nothing proposition. If taken to mean that a regulatory taking cannot result in less than a taking of the property owner's entire fee estate, we cannot agree. There has never been any question but that the Government can take any kind of recognized estate or interest in property it chooses in an eminent domain proceeding; it is not limited to fee interests. We see no reason or support for a different rule in inverse condemnation cases, and that is true whether the taking results from a physical or regulatory action.

In this case we have concluded that the record does not support a finding that the fee in the land, i.e., all economic use or value, was taken by this regulation, although that

---

**29.** This of course does not free the Government from paying for a 'categorical' taking even though it may have thought it was only restricting certain uses, if in fact the consequence of the regulatory imposition is to take essentially all economic value. *See, e.g., Lucas.*

**30.** "Of course, payment need only be made for what is taken, but for all that the Government takes, it must pay." *United States v. Dickinson*, 331 U.S. 745, 750, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1946).

**31.** In *Yancey v. United States, see supra* n. 26, just compensation was required to be paid for a loss in value sustained by the property owner. The Government did not take title to any of the 3,295 turkeys.

**32.** Identification of a specific property interest to be transferred to the Government should pose

little problem for property lawyers. Property interests are about as diverse as the human mind can conceive. Property interests may be real and personal, tangible and intangible, possessory and nonpossessory. They can be defined in terms of sequential rights to possession (present interests—life estates and various types of fees—and future interests), and in terms of shared interests (such as the various kinds of co-ownership). There are specially structured property interests (such as those of a mortgagee, lessee, bailee, adverse possessor), and there are interests in special kinds of things (such as water, and commercial contracts). And property interests play across the entire range of legal ideas: see, e.g., *Tompkins v. Superior Court of San Francisco*, 59 Cal.2d 65, 27 Cal.Rptr. 889, 378 P.2d 113 (1963) (did joint occupancy of an apartment give one occupant the kind of possessory property interest that carried with it the power to grant to police legal entry to search without a warrant for the other occupant's marijuana stash).

question is still an open one to be decided by the facts of valuation properly found. Since loss of economic use and value is the issue in this regulatory taking case, it is not possible, absent a valid determination in the record of the 'after imposition' value of the land, to know if a taking occurred, much less what the Government must pay for it. We are compelled, therefore, to remand the matter to the trial court for a determination of that essential piece of information, and for an initial determination as to its significance in order to decide whether there is a compensable taking of property.

## CONCLUSION

The judgment of the Court of Federal Claims is vacated and the matter is remanded for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**

NIES, Chief Judge, dissenting.

On procedural and substantive grounds, I respectfully dissent from the majority's remand for a determination of whether the United States must pay compensation under the Fifth Amendment to the extent that the 98 acres in issue lost a substantial part, but not essentially all, of its economic use or value. The majority's theory is contrary to Fifth Amendment "takings" jurisprudence as delineated by the Supreme Court and this court. Labelling its lost use/value theory a "partial taking" (ipse dixit) does not give it any legitimacy.

Inverse condemnation of land, like the affirmative exercise of the power of eminent domain, requires the transfer of the property found to be taken to the United States. Value is not a transferable interest. Thus, a claim for loss of value does not constitute a takings claim within the meaning of the Fifth Amendment.

In response to the dissent, the majority opines that any loss in value due to a regulatory restriction on land use can be easily transmuted into a taking of a property right in the land (Op. p. 1570, n. 26) and that such right will belong to the government (p. 1570). The majority's recognition that a successful claim of inverse condemnation of land transfers property rights is salutary. However, the majority's throw-in line on the transfer of a property right to the United States does not change the thrust of its opinion that damages must be paid to the extent of loss of value in the fee to the 98 acres.

The majority's partial taking theory, now vaguely tied to property rights, appears to borrow from the views of then Justice Rehnquist in his dissent in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 138–153, 98 S.Ct. 2646, 2666–2674, 57 L.Ed.2d 631 (1978), and restated in *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 506–521, 107 S.Ct. 1232, 1252–1261, 94 L.Ed.2d 472 (1986) that the taking of an identifiable property right should be compensable. However, the Supreme Court, in *Penn Central* (and in *Keystone*) rejected the division of the fee owner's bundle of property rights into separate takable rights. *Penn Central*, 438 U.S. at 130–31, 98 S.Ct. at 2662; *Keystone*, 480 U.S. at 470–501, 107 S.Ct. at 1232–1250. These decisions and all others require one to focus on the effect of a regulatory restriction on the totality of an owner's rights in the property. See also *Concrete Pipe & Prod. v. Const. Laborers Pen. Tr.*, —— U.S. ——, ——, 113 S.Ct. 2264, 2291, 124 L.Ed.2d 539 (1993) (citing *Keystone*). A diminution in value from denial of an economic use (even if the loss can be expressed in property right terms) is insufficient to effect a taking under *all* Supreme Court precedent so long as substantial other uses are left to the owner. While the Supreme Court may rethink and change its rulings, this court is not free to adopt positions in conflict with decisions of the Court, anticipating that the Court will be persuaded to adopt a dissenting Justice's view. In any event, the majority espouses compensation for a partial taking of the fee, which is not the same as the total taking of a severable interest. No support for the partial taking theory can be found even in dissents.

With respect to procedural error after the first remand, the issue in this case was limited to whether the entire fee had been taken, which turned on whether the property had a

substantial value after the denial of the permit. As this court specifically instructed in *Florida Rock II,*

> [I]f there is found to exist a solid and adequate fair market value (for the 98 acres) which Florida Rock could have obtained from others for that property, that would be a sufficient remaining use of the property to forestall a determination that a taking had occurred or that any just compensation had to be paid by the government.

791 F.2d 893, 903 (Fed.Cir.1986). This court in *Florida Rock II* remanded for a determination of whether substantial value remained. If it did, no taking occurred. The majority sides with the government on that issue and holds that the entire fee was not taken, which should have ended this litigation under principles of law of the case. Instead, the majority remands to allow Florida Rock to prove a different claim, indeed, a claim once raised and now subsumed in the judgment.[1] Therefore, the issue of a "partial taking," had it been argued on appeal by Florida Rock, would be outside the scope of appellate review because that party filed no cross appeal,[2] and it is not an argument in support of the judgment. *United States v. American Ry. Exp. Co.,* 265 U.S. 425, 435, 44 S.Ct. 560, 563, 68 L.Ed. 1087 (1923).

This court has no license to shape a case more to its liking by not only ignoring the law of the case but also effectively taking an appeal for Florida Rock. The trial court ordered the government to pay $1+ million for the 98 acres and ordered Florida Rock to tender a deed to the property. Florida Rock tied its fate to upholding that judgment. Under the majority's ruling that the entirety of the fee was not taken, Florida Rock loses.

While the procedural issue is dispositive, I will also address the merits of the majority theory of a "partial" taking which conflicts with current Supreme Court precedent and the precedent of this court.

### I

No legal subject has received the attention of scholars more than "takings" jurisprudence in recent years. A flood of literature has been produced advocating various theories of property and social responsibilities.[3]

---

1. Florida Rock's complaint in the Court of Federal Claims originally sought, *inter alia,* damages for the diminution in value of its land but, during the course of litigation, that issue dropped out in the first trial, and no appeal of the viability of that type of claim was taken. Rather, the issue litigated was whether the United States had taken the entirety of the fee to the 98 acres. The majority brings a closed issue back into the entirety of the case by its partial taking theory.

2. An appellee must file a cross appeal when issues it seeks to raise constitute an attack on the judgment below but not when the issues are merely alternative arguments in support on the judgment. Moore, *Moore's Federal Practice* ¶ 254.11[3] at 4–46 (1993).

3. Jed Rubenfeld, "Usings," 102 Yale L.J. 1077 (1993); Glenn Sugameli, "Takings Issues in Light of *Lucas v. South Carolina Coastal Council:* A Decision Full of Sound and Fury Signifying Nothing," 12 Virginia Env.L.J. 439 (1993); Erika Jones et al., "The Fifth Amendments Just Compensation Clause: Implications to Regulatory Policy," 6 Adm.L.J. of American U. 674 (1993); Hon. John M. Walker, "Common Law Rules and Land Use Regulations: *Lucas* and Future Takings Jurisprudence," 3 Const.L.J. 3 (1993); Richard Epstein, "*Lucas v. South Carolina Coastal*

Council: A Tangled Web of Expectations," 45 Stan.L.Rev. 1369 (1992); William W. Fisher III, "The Trouble with *Lucas,*" 45 Stan.L.Rev. 1393 (1992); Joseph L. Sax, "Property Rights and the Economy of Nature: Understanding *Lucas v. South Carolina Coastal Council,*" 45 Stan.L.Rev. 1433 (1992); Richard J. Lazarus, "Putting the Correct Spin in *Lucas,*" 45 Stan.L.Rev. 1411 (1992); Andrea L. Peterson, "The Takings Clause: In Search of Underlying Principles Part I—A Critique of Current Takings Clause Doctrine," 77 Cal.L.Rev. 1299 (1989); Douglas W. Kmiec, "The Original Understanding of the Taking Clause Is Neither Weak Nor Obtuse," 88 Colum.L.Rev. 1630 (1988); William A. Fischel, "Introductions: Utilitarian Balancing and Formalism in Takings," 88 Colum.L.Rev. 1581 (1988); Frank Michelman, "Takings, 1987", 88 Colum.L.Rev. 1600 (1988); Margaret Jane Radin, "The Liberal Conception of Property: Cross Currents in the Jurisprudence of Takings," 88 Colum.L.Rev. 1667 (1988); Susan Rose Ackerman, "Against Ad Hocery: A Comment on Michelman," 88 Colum.L.Rev. 1697 (1988); Richard A. Epstein, " *Takings: Private Property and the Power of Eminent Domain"* (1985); Margaret Jane Radin, "Property and Personhood," 34 Stan.L.Rev. 957 (1982); Frank Michelman, "Property, Utility, and Fairness: Comment on the Ethical Foundations of Just Compensation Law," 80 Harv.L.Rev. 1165 (1967).

Some espouse the view that property is held subject to complete control as to its use by the state and federal governments.[4] Others, at the opposite extreme, start from a premise that owners have a right to use their property in any manner, virtually without restriction, and, damages must be paid for any governmental interference with their use.[5] The more often the government must pay for exercising control over private property, the less control there will be. That is the reality.

The majority decision discusses "takings" law in a conventional manner through sections A and B of its analysis. But then it leads us into the camp of those who advocate damage awards for regulatory restriction (Op. p. 1568). Its economic justification that the government will now pay less for regulatory interference with private property is specious. In the absence of governmental restrictions rising to the very high level of a total "taking" of the property in issue required by Supreme Court precedent, *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 225–228, 106 S.Ct. 1018, 1026–1027, 89 L.Ed.2d 166 (1985); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 130–31, 136–38, 98 S.Ct. 2646, 2662, 2665–2666, 57 L.Ed.2d 631 (1978), the government does not now pay. It may pay more in the few cases where a claimant can satisfy those high standards, but it requires little imagination to envision the vast sums required for lost value/use claims if the government must pay for mere impairment of rights. Indeed, the objective of the theory is to preclude government regulation[6] precisely because regulation will entail too great a cost. Only in this respect will the theory save the public fisc.

The majority does not analyze loss of value and transfer of a property right separately under its partial taking theory. Essentially it sees no distinction in a property right, an economic use and a loss of value. However,

I will address lost value separately from property rights because the concepts, which may be the same under "law-and-economics" theories, are not interchangeable in established takings jurisprudence.

### A.

### *Loss of Value*

The majority view that lost value of land in itself is compensable is not the course set by the Supreme Court. *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1945), provides perhaps the clearest statement that an inverse condemnation claim respecting land rights requires an identification of the specific property interest to be transferred to the government. *Causby* involved a takings claim by reason of low military aircraft flights over the plaintiff's chicken farm which destroyed its use for that purpose. As held therein:

[T]he Court of Claims held, as we have noted, that an easement was taken. But the findings of fact contain no precise description as to its nature. It is not described in terms of frequency of flight, permissible altitude, or type of airplane. Nor is there a finding as to whether the easement taken was temporary or permanent. *Yet an accurate description of the property taken is essential, since that interest vests in the United States. United States v. Cress, supra* [243 U.S. 316], 328–329 [37 S.Ct. 380, 385, 61 L.Ed. 746 (1917)], and cases cited.

*Id.* at 267, 66 S.Ct. at 1069 (emphasis added).

"Value" is not a property right under Florida law or any state law that I can uncover. While much of takings law is unclear, one principle is not. Rights in land depend on the law of the particular state. *Preseault v. ICC*, 494 U.S. 1, 16 n. 9, 20–25, 110 S.Ct. 914, 924 n. 9, 108 L.Ed.2d 1 (1990) (majority and concurring opinions); *Ruckelshaus v. Mon-*

---

4. Sax, *supra*, "Property Rights and the Economy of Nature: Understanding *Lucas v. South Carolina Coastal Council*," 45 Stan.L.Rev. 1433 (1992). Although not so stated, such theorists would, in effect, superimpose the constitutional powers of Congress on land rights much as the constitutional powers may negate state immunity under the Eleventh Amendment.

5. Epstein, *Takings: Private Property and the Power of Eminent Domain*, (1985).

6. *Id.*

*santo Co.,* 467 U.S. 986, 1001, 104 S.Ct. 2862, 2871, 81 L.Ed.2d 815 (1984) ("Property interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."). Use of generalities respecting "property" law disserves the development of coherent takings jurisprudence. The right taken must be identified not only because, when transferred, it becomes the property of the United States. *Id.; Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184, 1190 (1981), but also because compensation is fixed at the fair market value of the transferred property right. *Yuba Natural Resources, Inc. v. United States,* 904 F.2d 1577, 1580 (Fed.Cir. 1990).[7] This bedrock requirement means that, the United States having purchased the fee or a property right, no second claim that the government took that specific property is possible.

In contrast, a lost value damage claim would impose not even an easement on the land. Successive claims are not only possible but likely. If loss of value alone created a claim, Florida Rock not only would receive the damage award, but also would keep its land. In effect, takings jurisprudence would become a novel type of Fifth Amendment tort claim for regulatory injury to the landowner under which the United States must pay damages while receiving no quid pro quo. This is not the law.

Inverse condemnation jurisprudence, like the direct exercise of eminent domain power, is based to a large extent on *in rem* concepts.[8] Thus, the theory of compensation simply for a loss in the land's value, not for the taking of a property right founded on Florida law, is untenable.

The Supreme Court has long *rejected* the position that a diminution in economic value

of private lands caused by government regulation of its use requires compensation. *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 131, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978); *Welch v. Swasey,* 214 U.S. 91, 29 S.Ct. 567, 53 L.Ed. 923 (1909). As stated in *Penn Central,* "[Supreme Court precedent] uniformly reject[s] the proposition that diminution in property value, standing alone, can establish a taking." *Penn Central Transp. Co.,* 438 U.S. at 131, 98 S.Ct. at 2663 (citing *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (75 percent diminution in value caused by zoning law); *Hadachek v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (87½ percent diminution in value)). The taking issue "is resolved by focusing on the uses the regulations permit." *Penn Central,* 438 U.S. at 131, 98 S.Ct. at 2663.

Appellants in *Penn Central* argued that the NYC landmark law effected a taking because its operation had significantly diminished the value of the Penn Central Terminal site. Appellants further argued that any restriction imposed on individual landmarks pursuant to the Landmark Law constituted a taking requiring just compensation. The Court found "no merit" in the argument. *Id.*

Thus, it is clear that no claim under the Fifth Amendment for a taking is stated by allegations that the property in issue simply lost value.

### B.

### The Property Rights in Issue

In the instant case, while there is no allegation that the government took a property right from the fee owned by Florida Rock, the majority suggests throughout its opinion that mining rights are the property rights in issue whose loss require prorata compensation. Florida Rock's position in contrast is

---

7. In a temporary taking, the proper measure of compensation is the value of the use of the property interest during the taking, since the government returns the property interest to the owner when the taking ends. *Yuba,* 904 F.2d at 1580–81.

8. "While the typical taking occurs when the government acts to condemn property in the exer-

cise of its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceeding." *First English Lutheran Church v. Los Angeles County,* 482 U.S. 304, 316, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250 (1986).

that the denial of the permit for mining effectively took the entire fee by reason of the denial of all economically viable use. This latter position tracks precedent that government actions, which leave some property rights in the owner may, nevertheless, so severely interfere with private land use that they are deemed equivalent to outright condemnation of the land for public use. *Pumpelly v. Green Bay Co.*, 80 U.S. 166, 177–180, 20 L.Ed. 557 (1871) ("taking" by flooding land by dam construction).

*Lucas v. South Carolina*, —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), is the latest in a series of "takings" cases issued since this case was previously on appeal. The plaintiff pleaded the taking of the "fee simple interest" to certain lands. *Id.* at —— n. 7, 112 S.Ct. at 2894 n. 7. *Lucas* is instructive that a taking of the fee may be found even though the owner was left with some property rights after the governmental action. The state regulations at issue in *Lucas* prohibited any building on Lucas' two ocean-front privately-owned lots. The regulations did not strip the owner of all property rights, e.g., the right to sell or devise the land. Nevertheless, the court held that the denial of all economically viable use by state regulation effected a categorical and total taking of the land unless, under state law, the action amounted to abatement of a "nuisance."⁹

The *Lucas* opinion begins with the recognition that a claim that a governmental regulation took private property for public use has generally required *ad hoc* factual inquiries into the circumstances of each case, there being no set formula for deciding that the action effected an inverse condemnation. *Id.*

at ——, 112 S.Ct. at 2893. In *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 224–25, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986) (citing *Penn Central Transportation Co.*, 438 U.S. at 124, 98 S.Ct. at 2659), the Court had provided the following guidance:

> To aid in this determination, however, we have identified three factors which have "particular significance": (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action."

In *Lucas*, two discrete categories of regulatory action were delineated as compensable without case-specific inquiry namely, (1) regulation allowing physical "invasion" of private property and (2) regulation denying *all* economically beneficial or productive use of land. —— U.S. at ——, 112 S.Ct. at 2893. Thus, where *less* than *all* economically beneficial or productive use of land is lost by reason of governmental regulation, one reverts to an *ad hoc* inquiry to determine whether the property in issue, here the fee, was taken.

In contrast, the majority divides the "ad hoc" inquiry into two types of takings, total and partial. After finding there is no categorical taking by physical invasion or prevention of *all* economic use of land, the two situations recognized in *Lucas*, the majority concludes that, under the *ad hoc* inquiry, the claimant may recover proportional compensation for the impairment of economic use if it passes a threshold beyond "diminution in value."¹⁰ Contrary to the majority, in an *ad*

---

9. This exception appears inapt as applied to federal regulation. The source of federal action is constitutional, as is the requirement for compensation. Precedent respecting takings by state action must be carefully parsed to determine whether the principles are equally applicable to federal regulation. The authority of Congress to impose use restrictions in this case rests on the commerce clause which, it is true, may be exercised to achieve purposes akin to a state's police power. *Brooks v. United States*, 267 U.S. 432, 436–37, 45 S.Ct. 345, 346, 69 L.Ed. 699 (1925). But it is not at all clear or logical that a state's nuisance law, which the *Lucas* court recognized as the basis for no compensation respecting a state's exercise of police powers, is also the limit of the federal power to take property without

compensation. The noncompensable seizure of houses, cars, boats, airplanes, or other private property in connection with drug crimes seems to belie the majority's assumption (Op. p. 1577 n. 10) that state nuisance law alone defines the interrelation of commerce and the Fifth Amendment.

10. The majority supports its theory with citation to *Loretto* and *Hendler*. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Hendler v. United States*, 952 F.2d 1364 (Fed.Cir.1991). Both are physical occupation cases decided under a categorical analysis, whereas the majority's taking theory is analyzed under an *ad hoc* analysis. In

*hoc* inquiry, the reduction in value resulting from use restriction pertains to whether a "taking" occurred. In making the "taking" determination, such loss is a factor. *Id.*, at —— n. 8, 112 S.Ct. at 2895 n. 8 (95 percent loss may not get "benefit of categorical formulation" but "keenly relevant to takings analysis"). The loss in value, however, is not the property taken (as discussed *supra* ) nor the measure of compensation. *Yuba,* 904 F.2d at 1580.

Under Supreme Court precedent, a Fifth Amendment claim that specific property has been taken is an all or nothing proposition. Either the property in issue has been taken and the fair market value at the time of the taking must be paid, or the property is not taken and no compensation is due. *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 800–803 (Fed.Cir.1993). The answer is "yes" or "no," not "partially." See *Lucas,* —— U.S. at —— n. 8, 112 S.Ct. at 2895 n. 8 ("Takings law is full of those 'all-or-nothing' situations."). Thus, under an *ad hoc* analysis, a 95 percent loss of value in the land, for example, may be sufficient, when considered with other factors, to require the government to purchase 100 percent of the interest in the land, i.e. the fee. Conversely, the landowner asserting the taking of the fee receives nothing, despite the loss in value caused by the regulatory action, if the factors weighed together do not mandate that the government must become an "involuntary purchaser" of the fee. *Florida Rock II,* 791 F.2d at 905.

The majority states that in *Lucas,* the Supreme Court touched upon but did not have to decide "the partial taking question." (op. p. 1568) The Supreme Court did note that precedent did not make it clear, even in a categorical taking, how to determine "the property interest against which the loss of value is to be measured." The court noted that "this uncertainty regarding the denomi-

nator in our 'deprivation' fraction has produced inconsistent pronouncements by the Court [citations omitted]." *Lucas,* —— U.S. at —— n. 7, 112 S.Ct. at 2894 n. 7. The majority seeks to shoehorn its "partial taking" theory into this open question. It does not fit. The *Lucas* court left open the question of how to determine the property interest in issue, the denominator. One would still determine whether there is a total taking of that property interest. The "partial taking" theory does not change the denominator or even the numerator. The majority's denominator remains the fee and if an *ad hoc* inquiry negates that the fee is taken, one simply would go on, (under the majority's view) to consider proportional compensation if a threshold of injury, more than "mere diminution", is passed.[11]

There can be no question that the "partial" taking theory of the majority does not change the property in issue (the denominator) from the fee to mining rights. If the taking of mining rights were the issue, one would simply evaluate the mining rights at the time the permit was denied. And there would be no need to remand to determine if a taking of such rights occurred. One would merely remand for their evaluation. Cf. *Penn Central,* 438 U.S. at 152, 98 S.Ct. at 2673 (Rehnquist, J. dissenting). Mining is clearly precluded and such right has zero value to Florida Rock after the action on the permit. The majority, instead, engages in a complicated before and after taking evaluation of the fee. But the loss in value *of the fee* does not reflect the value of mining rights on the date of permit denial. One must also take into account that the land is zoned for five-acre residential development as well. It is pure speculation whether the substantial residual value found by the majority reflects investment value for future mining use or for future residential use.[12] What the majority's

---

a permanent physical occupation case, the size of the property interest taken is irrelevant. *Loretto,* 458 U.S. at 434–35, 102 S.Ct. at 3175. Had *Loretto* been analyzed under an *ad hoc* inquiry, the result may well have been different. *See id.* at 452–53, 102 S.Ct. at 3185 (Blackmun, J. dissenting) ("[A]ny intelligible takings inquiry must also ask whether the extent of the state's interference is so severe as to constitute a compensable

taking in light of the owner's alternative uses for the property.").

11. Anomalously the majority remands for advice on the legal standard of what percentage must be taken to rise to the level of a partial taking.

12. Once mining rights are transferred to the government, the majority's theory of post-takings

evaluation analysis makes clear is that its discussion of mining rights merely serves to obfuscate its theory that a substantially less than total loss of value in the fee must be compensated.

The majority's partial taking theory finds no home in an *ad hoc* analysis. As reaffirmed most recently in *Concrete Pipe & Proc.,* —— U.S. at ——, 113 S.Ct. at 2290:

> [A] claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable. To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of the parcel in question. Accord, *Keystone Bituminous Coal Assn. v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987) ("[O]ur test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, [and] one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction' ") (citation omitted).

The *ad hoc* analysis answers the question whether the entirety of the property in issue should be deemed confiscated even where the owner retains some rights. It gives no guidance on how to determine what is the property in issue, i.e., the denominator. It is simply the formula to apply after the denominator is properly defined. That "complex question" is not facilely answered by giving the restricted interest a name.

The law has been and continues to mandate that a court may not look only to the part of the entirety of property rights of a

fee owner which a regulation restricts, whether called a property right, an economic use, or simply value. As *Concrete Pipe* informs us, there is always a total taking of that interest and conversely, a partial taking of the fee. This is, indeed, the precise rationale for requiring an *ad hoc* analysis. One must weigh the rights (and value) of the property in issue before regulatory action against the rights (and value) therein after regulatory restriction and find confiscatory disparity between the two values for a taking to be found. Thus, where only a portion of the acreage of a tract is affected by denial of a wetlands permit, we have held under an *ad hoc* analysis that no taking of the tract occurred and no compensation was due. *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184, 1192 (1981).[13]

The difficult issue of what is the property in issue (the denominator) was avoidable in *Lucas* because the plaintiff claimed the fee was taken. Here as well. Respecting the denominator, as indicated, we do not have a question of the taking of a *severable* interest, i.e., mineral rights from the bundle of rights in the land.[14] Indeed, Florida Rock abandoned any issue other than the taking of the fee in its entirety prior to the first appeal. *Florida Rock III,* 21 Cl.Ct. 161, 169 n. 5 (1990). At this stage of proceedings, nothing less is at stake than the entire fee interest in the 98 acres. The majority's ruling that the fee was not taken under an *ad hoc* analysis mandates reversal.

## II

Inasmuch as the majority remands for determination of the difference in value of the fee, before and after permit denial, it is appropriate to point out the legal error in the $10,500 valuation figure as the value of the

value based on offers to buy the land because of possible change in regulations is thrown entirely askew. There could be no change in regulations which would give a subsequent owner the right to mine the mineral estate which the majority agrees becomes government property.

13. Indeed, in this case, it is far from clear in my mind that the 98 acres should be treated as a severed tract rather than part of the 1500+ total acreage.

14. It may also be noted that there is no issue involving frustration of Florida Rock's mining business. This court in *Florida Rock II* concluded that the trial court's finding of a taking based on the fact that Florida Rock was prevented from conducting a profitable mining business made the case "improperly one to recover for frustration of business purposes." *Id.*

fee *prior* to denial of the permit. One must focus on the fair market value on the date of the denial, namely on October 2, 1982, because that is the date of the alleged taking. *First Lutheran,* 482 U.S. at 321 n. 10, 107 S.Ct. at 2389 n. 10 (the valuation of property taken must be calculated at time of taking); *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 10, 104 S.Ct. 2187, 2194, 81 L.Ed.2d 1 (1983) (just compensation determined on the date property is taken); *Tabb Lakes v. United States,* 10 F.3d 796, 803 (Fed.Cir.1993) (compensation is measured from the time the taking occurs).

The pre-denial value ascribed to the fee by the trial court of $10,500 is the value of the wetlands acreage with *no* regulations. The trial court based the $10,500 figure on the acquisition cost with upward adjustments. *Florida Rock Indus., Inc. v. United States,* 21 Cl.Ct. 161, 169 n. 5 (1990) (*Florida Rock III* ).

On the evidence of record, the $10,500 per acre figure does not reflect the fair market value of the fee immediately prior to the denial of the permit on Florida Rock's property. The value of these lands prior to permit denial had previously been diminished by the state and federal *regulations* applicable to all wetlands. However, the regulations in themselves constitute no taking. As specifically held in *United States v. Riverside Bayview Homes, Inc.:*

> A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

474 U.S. 121, 127, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985).

Thus, any loss attributable to the regulations is noncompensable. As evidenced by enactment of the FWPCA, the nation has come to recognize that wetlands are necessary resources which require special protection from unbridled development. Contrary to the majority, the limitations of development only under permit may be imposed on this type of property without compensation. *Id.*

Owners of such property have no right from ownership to use lands with this natural resource unfettered. Ownership of property carries responsibilities to the community as a whole as well as privileges. Like height limitations or five-acre zoning laws or other similar restrictions on use, the government's assertion of control generally over use of wetlands, which devalues all such property to some extent, is not itself compensable. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). Thus, the fair market value of the fee must be determined with these general restrictions on land use in place, not as if no regulations of wetlands existed at all. Only with this adjustment is the *pre-taking* value of the property properly determined. Indeed, the evidence of sales of "comparable" lands in the 1980's, discussed by the majority in connection with *post-taking* valuation, appears in fact to reflect the *pre-taking* impact of general wetlands regulations on neighboring property values.

The majority treats sales of wetland property on which no permit was denied as evidence of the value of wetland property on which a permit was denied. Under the majority's rationale, the denial of the permit has *no effect* on valuation. Actually, the majority is suggesting a partial taking occurred based on a comparison between the original value of the subject land and the later lower value of other property, lower because depressed by general regulations, but for which no permit was denied. That would mean the existence of general regulations respecting wetlands effected the taking, which is contrary to the Supreme Court's decision in *Riverside Bayview, supra.* Moreover, the actual alleged act of taking under the majority's view

can be simply ignored. Muddled though land takings law may be, it is not so muddled that these concepts can pass muster.