**BROADWATER FARMS JOINT VENTURE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 94–1041 L.

United States Court of Federal Claims.

March 27, 1996.

Keith A. Rosenberg, Washington, D.C., for plaintiff.

Daniel G. Steele and Thomas L. Halkowski, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

HODGES, Judge.

This Fifth Amendment takings case is before the court after trial on liability. Plaintiff asserts that it is entitled to compensation because actions by the United States Army Corps of Engineers resulted in plaintiff's inability to use its property. We address two threshold questions in this opinion: 1) Whether the Corps of Engineers' cease and desist order and settlement agreement in this case constitute final agency action; and 2) Whether the property interest affected by the Corps' action is of such magnitude in comparison with the entire parcel to constitute a compensable regulatory taking.

### FACTS

Broadwater Farms purchased property known as Spyglass by foreclosure sale in the fall of 1987, and closed on the property in March 1988. The Spyglass property is located in Anne Arundel County, Maryland, in the Chesapeake Bay Critical Area. It was subdivided, platted, and approved for residential development by the County in 1978. Broadwater Farms viewed this as a benefit because it would not have to pursue further zoning efforts. It could use the plans in the original plat with only a few changes.

The 51-lot property comprised 24 lots in Phase II and 27 lots in Phase III. Phase II was substantially developed at the time of purchase; Phase III was unimproved.

Broadwater Farms is a general partnership that buys unimproved land and prepares it for residential developers by contracting out to develop infrastructure for residential development, including roads, electricity, storm drains, and sewage removal systems. Broadwater Farms sold all of its lots in Phase II to a residential developer in August 1988, and later contracted with the same developer to deliver finished lots in Phase III. A finished lot is one that allows the builder to obtain the necessary permits from the county to begin construction. The utilities are in place and the grading and paving are complete.

Broadwater Farms hired an engineering consulting firm shortly after purchase to upgrade the 1978 plat and to ensure that it would meet county requirements for public works agreements, utility agreements, and grading permits. The consultants redesigned some grading plans that the county considered to be outdated. Most of the plans were approved in 1988, and the redesigned grading plan was approved in the late spring of 1989.

The plans for Phase III contained three roads. Gunner Run Road connected Phases II and III, and served as the access road for all of the waterfront lots and some of the uplands lots. Calico Court and Buccaneer Court provided the only access to 10 lots above Gunner Run Road.

Plaintiff began improvements to the property after receiving the grading plan approval. The land was cleared and the roads were brought up to grade by using fill. Buccaneer Court and Calico Court required installation of filter cloth and grid systems for structural purposes because they were built in low areas of the property. The sewer lines, storm drainage system, and ditches were completed. By the middle of August, the work on Phase III necessary to deliver finished lots was 85% complete. Plaintiff would have finished its work by the end of August.

Near the beginning of August, Broadwater Farms became aware of the Corps' interest in the property. A representative from the Corps' enforcement section, Mr. Frank Plewa, came to the property to survey the area. Mr. Plewa indicated upon arrival that Phase II had been built in a wetland, and that much of the work in Phase III was also in violation

of the Clean Water Act. The next day, Mr. Plewa returned with representatives from the Corps' permit division, and he told plaintiff that a stop-work order would be issued. Broadwater Farms received a cease and desist order from the Corps on August 18.

Plaintiff's representatives contacted the Corps regarding the order, but they were not satisfied with the response. Mr. Plewa implied in one conversation that no houses could be built in the area believed to be wetlands. Broadwater Farms called upon its Congressman to schedule a meeting with the Corps.

Broadwater Farms and the Corps met on September 28. Representatives from the Corps' enforcement and permit divisions attended. Broadwater asserted at the meeting that it had acted consistently with the permits and plans approved by the county. The Corps directed that work could continue work on Gunner Run Road, but all work on Buccaneer and Calico Courts would have to stop.

Plaintiff's president and its engineer spoke to Mr. Plewa after that meeting on several occasions in attempts to preserve the development or to offer compromises, but it was not encouraged by Mr. Plewa's responses. In one instance, Mr. Plewa stated that the Corps had no reason to work something out because of the developer's "attitude."

On November 20, Broadwater Farms received a letter from the Chief of the Enforcement Section outlining an agreement "reached pertaining to the areas authorized by this office for development in the Phase III subdivision." Broadwater Farms was ordered to restore 11 lots "to the maximum extent possible," and to keep pristine portions therein undisturbed. The agreement allowed Gunner Run Road to remain, although it ran through the wetlands at the entrance to Phase III. Plaintiff would have to provide mitigation elsewhere. The Corps decided that Buccaneer Court and Calico Court must be removed. Calico Court was in the wetlands along with most of Buccaneer Court. Lots at the end of Calico Court which were not within wetlands were approved for development, but access to them through wetlands was prohibited.

The Corps' letter stated, "Your cooperation in performing the restoration will be considered in the final determination of action on this matter. . . . If we do not receive your response within [15 days], we will assume you do not intend to perform the restorative work and we will proceed to resolve the violation through alternate enforcement procedures." The letter did not suggest that Broadwater Farms could apply for a permit in the future.

Plaintiff reconfigured the lots based on the Corps' wetlands delineation, but it could not devise a way to use lots at the end of Calico Court where development was allowed because of the access restriction. Those lots were surrounded by other homeowner lots and wetlands. Before the Corps entered the property, Broadwater Farms had filed a request with the county to rezone some land on the property from open space to residential. That application was delayed because of the Corps' action.

## DISCUSSION

### I. Exhaustion of Remedies— Futility of Permit

A compensable regulatory takings occurs when the regulation goes "too far." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), *quoted in Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1014, 112 S.Ct. 2886, 2892, 120 L.Ed.2d 798 (1992). A court must determine the precise extent of the regulation's interference with the claimant's property interest. When a regulatory scheme provides for a permitting process, a Fifth Amendment takings claim normally is not cognizable until the permit has been applied for and denied. *See Conant v. United States,* 12 Cl.Ct. 689, 691 (1987) (citing *United ed States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *see MacDonald, Sommer & Frates v. County of Yolo,* 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986) (prerequisite to a takings claim is a "final and authoritative determination of the type and severity of development legally permitted on the subject property"). The possibility that

a permit may be granted precludes any other action from constituting a taking. *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 801 (Fed.Cir.1993) (where the cease and desist order "specifically left the door open" to obtaining a permit). It is not necessary for a landowner to engage in a futile, pro forma exercise of agency review when no possibility exists that a permit will be granted. *Compare Parkview Corp. v. Department of the Army,* 490 F.Supp. 1278 (E.D.Wis.1980) (where the government's indication that a permit would not be granted foreclosed the need for applying for a permit) *and Conant,* 12 Cl.Ct. 689 (where the circumstances did not indicate that applying for a permit would be futile).[1]

█ Broadwater Farms did not apply for a permit because it believed that it would have been pointless to do so. The government's position concerning the property was sufficiently strong and adverse to make the application for a permit a futile exercise. *See Parkview,* 490 F.Supp. at 1282. The outcome of a permit application was clear and would be a wasteful exercise. Furthermore, plaintiff argues that the Corps would not have processed a permit because federal regulations prohibit the Corps from even considering an application in this situation.

*A. The Practicality of Pursuing a Permit*

From plaintiff's perspective, the Corps' enforcement stance was equivalent to a denial of a permit for any residential development in the lots designated as wetlands. From the first day that Mr. Plewa visited the site, the Corps' position was clear: development could not go forward in the wetlands. The Corps never suggested that a permit could be filed. The Corps' order to remove Calico and Buccaneer Courts left little room for plaintiff to believe that a permit process would produce a favorable result. If there were any possible use in the area, then the removal of the roads in the enforcement proceeding made

little sense. There was no feasible alternative access to the two developable uplands lots.

Defendant highlights the differences between an enforcement proceeding and a permit. It argues that the permit process could have resulted in some accommodations for development and that the immediate and extensive restoration requirement did not foreclose approval of re-development later. Defendant's testimony at trial concerning its openness to considering a permit was vague and unconvincing. We heard no credible evidence that development of value to plaintiff would have been allowed in the wetlands.

We do not state that the Corps' demand for complete and immediate restoration would effectively bar a permit in every instance. Massive restoration efforts may be required to regain the values of the destroyed wetlands as quickly as possible and to provide a deterrent to future illegal fill activities. In such circumstances, the Corps might process an application for further development of those wetlands in the future. The regulations state:

> In determining what initial corrective measures are required, the district engineer should consider whether serious jeopardy to life, property, or important public resources ... may be reasonably anticipated to occur during the period required for the ultimate resolution of the violation.

33 C.F.R. § 326.3(d)(1). The district engineer gave no justification for the corrective measures he required. The Corps did not view this as a high quality wetland, and it gave no hint that restoration was necessary as an immediate emergency action. In fact, the area may no longer be considered wetlands because Gunner Run Road, the one road that the Corps allowed to remain, has changed the area topography.

Defendant argues that if this action had been considered a complete ban on develop-

---

1. This court has held that it is not necessary to apply for a permit if the process is so burdensome or futile that it "effectively deprives the property of value." *Hage v. United States,* 35 Fed.Cl. 147, 164 (1996) (Smith, C.J.); *see also Stearns Co. v. United States,* 34 Fed.Cl. 264

(1995). A takings claim is ripe when the issues are fit for judicial decision and hardships occur if the court declines to hear the claim. *Hage,* 35 Fed.Cl. at 163 (citing *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).

ment, the Corps would have placed a conservation easement on the land. Without that action, the government contends that there is no reason to believe that future development on the property has been foreclosed. No provision in the regulations confirms this position.

The Corps was treating this matter as a permit proceeding. Permit representatives were on site with Mr. Plewa from the beginning. The Permit office participated in the September meeting. In October, the Chief of the Permits Section requested comment from the Maryland Historical Trust regarding the development's impact on historic resources. These requests are common in a permit procedure, but they have no application in an enforcement action.

No reasonable landowner would find a "door left open" for obtaining a permit in the circumstances of this case. Enforcement and permitting offices of the Corps were working in step. Development in the wetlands would not be allowed, and the imposition of maximum corrective measures was the functional equivalent of telling the landowner that a § 404 permit would not be approved. The November settlement agreement left Broadwater Farms in an absurd position. If it did not restore the property, it could be subject to criminal and civil penalties; and if there was any hope that access would be allowed through the wetlands, it made little sense to order the existing work removed. The conclusion must be that the Corps would not allow development.

### B. Permit Availability Under the Regulations

The November settlement agreement's requirement that the property be returned to its pre-construction, natural "wetlands" condition prevented the Corps from accepting and processing a permit once the land has been restored.

[F]ollowing the completion of any required initial corrective measures, the district engineer will accept an after-the-fact permit application unless he determines that one of the exceptions ... is applicable.... Situations where no permit application will be processed or where the acceptance of a permit application must be deferred are as follows:

(i) No permit application will be processed when restoration of the waters of the United States has been completed that eliminates current and future detrimental impacts to the satisfaction of the district engineer.

33 C.F.R. § 326.3(e)(1). The regulations confirm that requiring a permit where a landowner is ordered to undo all of its construction and restore the land to the maximum extent possible makes little sense.

Defendant attempts to distinguish a § 404 permit from an after-the-fact permit. According to defendant, a § 404 permit refers to one filed and approved before any construction on wetlands, while an after-the-fact permit refers to retroactive approval of development initiated without proper authority. Thus, if a violator is forced to restore the property to its natural condition, he is thereafter precluded from seeking and obtaining an after-the-fact permit, but he may apply for a regular permit after the property has been returned to a "before-the-fact" state. That is to say, where the regulation states, "No permit application will be processed....", defendant wants it to mean "No *after-the-fact* permit will be processed...." We disagree.

 This language falls under the heading of subsection (e) *After-the-fact permit applications.* "While a title or heading may help clarify or point the meaning of an imprecise or dubious provision, it may not alter or limit the effect of unambiguous language in the body of the statute [or regulation] itself." *National Fuel Gas Distribution Corp. v. TGX Corp.,* 950 F.2d 829, 835 (2d Cir.1991) (citation omitted). The "heading of a section cannot limit the plain meaning of the text." *Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad Company,* 331 U.S. 519, 529, 67 S.Ct. 1387, 1392, 91 L.Ed. 1646 (1947) (citations omitted). "Where particular language is used in one section [of the regulations] but not another, the term or its equivalent should not be implied where it is excluded." *United States v. Heller,* 635 F.2d 848, 855 n. 12 (Temp.

Emer.Ct.App.1980), *quoted in Mapco Alaska Petroleum, Inc. v. United States,* 27 Fed.Cl. 405 (1992) (providing alteration).

Subsection (e)(1) declares that after-the-fact permit applications will be accepted except in certain circumstances, while subparagraph (i) refers to permit applications. The language is unambiguous. Where the regulation reads "No permit," it must mean "No permit."

If the government requires complete restoration of the property, it may not consider any permit application so long as the property remains a protected area. If less than complete restoration has been ordered, the government may accept and process permits because presumably some development can be salvaged from the property. The extent of the initial corrective measures and the omission of any directions about a permit process show that the Corps intended complete restoration.

The wording of the November settlement agreement is explained by the regulations. Depending upon the extent to which the government orders restoration, the Corps may maintain the right to proceed with legal remedies even after the landowner has complied with the order.

> In unusual cases where initial corrective measures substantially eliminate all current and future detrimental impacts resulting from the unauthorized work, further enforcement actions should normally be unnecessary. For all other cases, the district engineer's order should normally specify that compliance with the order will not foreclose the Government's options to initiate appropriate legal action or to later require the submission of a permit application.

33 C.F.R. § 326.3(d)(1). The first sentence of this section reveals that when the government orders complete restoration of property it need not resort to further enforcement actions. In other words, once the property is restored, no violation remains to redress. The second sentence suggests that where the district engineer orders less than fully corrective measures, the Corps should preserve its option to pursue further enforcement action or to require the landowner to apply for a permit. Thus, even if the landowner complies with the order, the government would still have the right to intervene if problems were to arise or persist in other areas on the property not subject to the initial corrective order.

The November settlement agreement was not a request for less than complete restoration. The Corps demanded that 11 lots be restored to "the maximum extent possible or remain undisturbed." It did not reserve enforcement rights or inform plaintiff of the permit process as it would if it were requiring less than the elimination of "all current and future detrimental impacts resulting from the unauthorized work." The warning in the last paragraph that the Corps would seek alternative enforcement procedures does not contradict this conclusion. It applied only if plaintiff chose not to do anything in response to the order. If the Corps were calling for less than complete restoration, the paragraph should have stated that *even after compliance,* the Corps may decide to enforce by other measures. Furthermore, the absence of any reference to a possible permit strongly suggests that the extent of the required restoration would leave little room for the permit process.

## II. *Parcel As A Whole*

Mere diminution in value cannot establish a taking. *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The question is whether a prohibition on development of twelve lots in this case amounts to a denial of economically viable use.

The takings determination relies on comparing the land subject to restrictions to plaintiff's entire property or "parcel as a whole."

> "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and

extent of the interference with rights in the parcel as a whole....

*Id.* at 130–31, 98 S.Ct. at 2662. The definition of the parcel is critical because it controls whether there has been a mere diminution in value or a compensable taking has occurred. Indeed, the Supreme Court has noted the importance of this inquiry in the theoretical calculus of takings jurisprudence:

> Regrettably, the rhetorical force of our "deprivation of all economically viable use" rule is greater than its precision, since the rule does not make clear the "property interest" against which the loss of value is to be measured. When, for example, a regulation requires a developer to leave 90% of a rural tract in its natural state, it is unclear whether we would analyze the situation as one in which the owner has been deprived of all economically beneficial use of the burdened portion of the tract, or as one in which the owner has suffered a mere diminution in value of the tract as a whole.

*Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1016–17 n. 7, 112 S.Ct. 2886, 2894 n. 7, 120 L.Ed.2d 798 (1992). The Federal Circuit has concurred on this point:

> If the tract of land that is the measure of the economic value after the regulatory imposition is defined as only that land for which the use permit is denied, that provides the easiest case for those arguing that a categorical taking occurred. On the other hand, if the tract of land is defined as some larger piece, one with substantial residuary value independent of the wetlands regulation, then either a partial or no taking occurred, depending on the test as described in *Florida Rock [Industries, Inc. v. U.S.],* 18 F.3d [1560] at 1567 [ (Fed.Cir. 1994) ] *et seq.* This is the denominator problem.

*Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1180 (Fed.Cir.1994) (footnote omitted).

▉ The parcel realistically should represent the entirety of plaintiff's interest. A section of property is not a "separate parcel" solely because the government's action affects only that section. *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust,* 508 U.S. 602, 642–44, 113 S.Ct. 2264, 2290, 124 L.Ed.2d 539 (1993); *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed.Cir.1993). The Supreme Court has rejected such an analysis:

> [A] claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable. To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of the parcel in question.

*Concrete Pipe,* at 642–44, 113 S.Ct. at 2290. The extent of the parcel may depend on a number of factors: the contiguity of the lands, purchase dates, unity of use, and the extent that the protected lands affect the value of the remaining land. *Ciampitti v. United States,* 22 Cl.Ct. 310 (1991); *American Savings and Loan Association v. County of Marin,* 653 F.2d 364 (9th Cir.1981).

Plaintiff argues that each individual platted lot should be treated as a separate parcel. That theory would amount to a compensable categorical regulatory taking because 100% of each lot is taken. *Lucas,* 505 U.S. 1003, 112 S.Ct. 2886. No productive options are left on any lot and no non-regulated portion of the lot remains to provide offsetting value. Defendant contends that the relevant parcel is the total of Phase II and III, or 51 lots. Therefore, a restriction on 12 lots in comparison to the 51–lot development project is a non-compensable diminution in value.[2] We find that Phase III represents the relevant parcel in the circumstances of this case.

The Federal Circuit suggested in *Tabb Lakes* that each lot of a residential subdivision could not be considered a separate parcel. "If that were true, the Corps' protection of wetlands ... would, *ipso facto,* constitute a taking in every case where it exercises its

---

2. Plaintiff alleges that 12 lots were taken by the government action. The 12–lot calculation is the result of the reconfiguration of lots after the wetlands delineation and the access restrictions. Defendant did not contest this point and it does not affect our decision.

statutory authority." *Tabb Lakes,* 10 F.3d at 802. Plaintiff argues that this case is unique because the Spyglass property was platted and subdivided before purchase. Thus, plaintiff did not buy a piece of property consisting of a certain number of lots; it bought 27 individual lots.

Subdivision prior to purchase does not necessarily mean that the lots are separate parcels. Plaintiff did not treat them in that manner before the Corps intervened. All 51 lots were financed and purchased at the same time, as a whole. *See Ciampitti,* 22 Cl.Ct. at 320 (where the "most persuasive consideration" was that all of the lots were treated as a single parcel for purchase and financing). They were developed as a residential community. In Phase III, Broadwater Farms would convert the raw piece of land into developable property by providing roads and other infrastructure that connected each lot. Plaintiff entered a contract with one developer to deliver finished lots. The project's value to plaintiff was in overall development of the property, not in each individual lot.[3] "It would be inappropriate to allow [plaintiff] now to sever the connection he forged when it assists in making a legal argument. [Plaintiff] is, in effect, asking to isolate the least valuable portion of the purchase when he himself saw the parcels as inextricably linked [when he purchased them]." *Ciampitti,* 22 Cl.Ct. at 320.

Phase II is not included in the relevant parcel because Broadwater Farms did not own that property in 1989. There may be no "rigid rule that the parcel as a whole must include all land originally owned by plaintiffs." *Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381, 392 (1988) (summary judgment denied), *Loveladies Harbor, Inc. v. United States,* 21 Cl.Ct. 153 (1990), *aff'd,* 28 F.3d 1171 (Fed.Cir.1994). It is a determination that relies on the particular facts of the case.

Phase II development was complete soon after plaintiff's purchase, and was sold in the regular course of business a year before the Corps became involved in this matter. We have no indication that plaintiff disposed of the property in anticipation of a takings claim. It would not realistically reflect plaintiff's property interest to charge it now for property it did not own at the time of the taking.

### III. Denial of Economically Viable Use

▇▇▇▇ When a landowner loses all economical use of his property, a compensable taking has occurred. *Lucas,* 505 U.S. at 1019, 112 S.Ct. at 2895. The government's liability is not limited to "categorical" takings. *Florida Rock Industries, Inc. v. United States,* 18 F.3d 1560, 1570 (Fed.Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). When a governmental action interferes with less than all of the property, the outcome is less certain. *Id.* at 1567 (explaining that a categorical taking clearly occurs with a 95% loss in value, but that "the correct outcome is no longer clear" when there is a 62% loss in value). In those cases, the courts have balanced pragmatic considerations such as economic impact, interference with distinct investment-backed expectations, and character of the government action. *Id.*

▇▇▇ In this case, plaintiff's loss of 12 out of 27 lots was a diminution in value. In a lot-to-lot comparison, Broadwater Farms was denied 44% of the parcel; compared acre to acre, the 12 lots constitute about 40% of the 27-lot parcel.

No more than a mere diminution has occurred in terms of sales value. Broadwater Farms retained the use of the remainder of the 27-lot property, and it sold each remaining lot for a gross sale total of over $1.07 million.[4] With the 12 lots, plaintiff's gross

---

3. Plaintiff contends that the State of Maryland's treatment of each lot as a separate parcel for tax purposes is decisive on this issue. This is an important argument. The Supreme Court has noted that a solution to the "parcel as a whole" question may lie in "whether and to what degree the State's law has accorded legal recognition and protection to the particular interest in

land...." *Lucas,* 505 U.S. at 1016 n. 7, 112 S.Ct. at 2894 n. 7. However, we find that other considerations show that the proper parcel as a whole is Phase III.

4. Both parties entered expert reports for the record, although we deferred expert testimony for damages, if necessary. Plaintiff's expert report

sales could have been $1.48 million. The reduction in gross sales is roughly 28%.

Broadwater Farms bought Phase II and III together for $592,000 in 1988. It sold Phase II to the developer in 1989 for $900,-000 and used that sale to pay off the original loan. Broadwater Farms then borrowed $700,000 to finance the construction on Phase III and obtained $400,000 worth of letters of credit to secure utility agreements, public works agreements, and grading permits in Phase III.

Plaintiff's claim for compensation of $845,-212 represents the difference in the total net income between the projected and actual sales. Actual sales netted a loss of roughly $50,000, whereas the projected sales would have provided almost $800,000 in income. The loss, according to plaintiff, is attributable to the increase in the cost of sale—almost a 40% increase from projected costs to sell the lots.

In *Jentgen v. United States,* 228 Ct.Cl. 527, 657 F.2d 1210 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982). The Court of Claims found no compensable taking where plaintiff retained the use of 20 acres of an 80–acre parcel. The court found only a diminution in value even though, at best, the market value would equal the original purchase price. "Reduced to its essentials, this case merely presents an instance of some diminution in value, or frustration of reasonable investment-backed expectations ...—an insufficient basis ... to establish a taking." *Id.* at 534, 657 F.2d 1210.

Likewise, in *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 490, 657 F.2d 1184 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982), no compensable taking arose because the Corps' intervention had not extinguished a fundamental attribute of ownership or prevented plaintiff from "deriving many other economically viable uses from its parcel...." In that case, the area subject to restriction made up only 20% of the total acreage of the parcel and only 33%

of the developable lots. The court found no compensable taking even though only 25% of the construction area was available after the restrictions. There was still developable area within the parcel and the total fair market value was twice that which plaintiff had paid for the property. The court concluded that the "remaining land uses are plentiful and its residual economic position very great." *Id.* The impact, therefore, was not more than a diminution in value.

The loss of the 12 lots in this case is not a denial of economically viable use of the parcel as a whole. The property had substantial residual value. The only way to find a taking is to adopt plaintiff's argument that each lot should be viewed as a separate parcel. A more realistic view is that plaintiff simply has been prevented from exploiting a property interest. *See Penn Central,* 438 U.S. at 130, 98 S.Ct. at 2662.

## CONCLUSION

Plaintiff has not applied for and been denied a permit to develop its property, but that fact does not preclude a cognizable Fifth Amendment takings claim in these circumstances. The Corps effectively rendered a final agency decision when it ordered plaintiff to stop work, then directed it to perform extensive restorative work that was inconsistent with the possibility of future development. Federal regulations prevented the Corps from accepting a permit application in such circumstances.

 A taking occurs where: (1) the government denies economically viable use of property; (2) the property owner had distinct investment-backed expectations; and (3) the property owner's interest was vested by state property law and was not within the power of the state to regulate under the common law nuisance doctrine. *Loveladies Harbor,* 28 F.3d at 1179. Plaintiff cannot show in this case that the Corps' action went "too far." [5]

states that one remaining lot would be sold in 1995 for $67,500.

**5.** Several arguments advanced by the government are not addressed in this opinion because

they are unnecessary for the decision. For example, we do not decide the extent of plaintiff's investment-backed expectations.

The Clerk will enter judgment for defendant. No costs.