**Nancy A. and Edward W. ROBBINS, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 96–779L.**

United States Court of Federal Claims.

Feb. 20, 1998.

**382**

Paul J. Harris, Richmond, VA, for plaintiffs.

Pamela S. West, Washington, DC, with whom was Assistant Attorney General Lois J. Shiffer, for defendant. Robert V. Smyth, U.S. Army Corps of Engineers, Nashville, TN, of counsel.

### *OPINION*

MILLER, Judge.

This case is before the court after argument on defendant's motion for summary judgment. The issue is whether the designation and/or delineation of plaintiffs' property as jurisdictional wetlands—resulting in the recision of a private contract to sell the property—constitutes a compensable taking under the Fifth Amendment.

## FACTS

The following facts are undisputed, unless otherwise noted. Nancy A. and Edward W. Robbins ("plaintiffs"), own and reside on a 38.4–acre parcel of land in Paris, Tennessee (the "property"), which supports a house, barn, shed, and machine shop. Plaintiffs purchased the property in 1975 as an investment that they eventually planned to sell in order to provide for their retirement.

On March 4, 1994, Keith Baker signed a land sales contract with plaintiffs to purchase the property for $9,000.00 an acre, or $351,-000.00, and subsequently issued a check for a $100,000.00 deposit. Mr. Baker intended to sell the home and a portion of the acreage and develop the remainder of the land as a mobile home sales lot.

Shortly after the contract was signed, Mr. Baker's real estate agent, Joe B. Lipps, learned from a Paris, TN city employee that the property was in a floodplain and would require a permit for development. Mr. Lipps was also informed that the property might be wetlands. On March 7, 1994, plaintiffs contacted the U.S. Army Corps of Engineers (the "Corps") and requested that it determine whether regulated wetlands existed on the site; Carl Olsen, a representative from the Corps inspected the site a week later. The Corps based its wetlands determination on three environmental parameters: hydrophytic vegetation, hydric soils, and hydrology, in accordance with the 1987 Corps of Engineers Wetland Delineation Manual. On March 28, 1994, the Corps notified plaintiffs of its determination: The property contained jurisdictional wetlands pursuant to section 404 of the Clean Water Act, Federal Water Pollution Control Act Amendments of 1972, § 404, *as amended,* 33 U.S.C. § 1344 (1994).[1] The Corps advised plaintiffs to retain a wetlands delineation expert and gave them information regarding the permit application pro-

---

1. Specifically, the determination stated that
   [t]he Robbins family property, which is located below 'headwaters' in the McGowan Branch watershed, reveals the presence or evidence of three characteristics of regulated wetlands on a large portion of the property including the majority of the highway frontage on SR 79. McGowan Branch and its adjacent wetlands

   are waters of the United States pursuant to Section 404 of the Clean Water Act.

   . . . . .

   ... A wetlands delineation by a qualified consultant verified by our office is an acceptable procedure for determining the extent of proposed activities in regulated wetlands.

cess under section 404 and the pertinent regulation, 33 C.F.R. § 325 (1997).

In late March 1994, having been informed of the wetlands determination, and after receiving several estimates for the cost of site preparation and development,[2] Mr. Baker demanded cancellation of the contract and a return of his deposit because "the wetlands determination made the land unsuitable for [his] use." Affidavit of Keith Baker, Mar. 27, 1997, ¶ 8. The parties dispute whether Mr. Baker or plaintiffs canceled the contract and whether plaintiffs would have a cause of action for breach of contract or specific performance in light of an escape clause in the contract. Although this unresolved issue is not particularly material to the takings issue, it does highlight the nature of the land sale cancellation as a private action. The parties also dispute whether the Corps knew of the land sale contract when it made its wetlands determination and, if so, to what effect.

In their April 1994 correspondence to the Corps, plaintiffs stated that the land sale had fallen through and that they would not be seeking a section 404 permit. Responding to plaintiffs' letter dated May 5, 1994, in which they stated that they could not afford to hire a wetlands expert for the wetlands delineation, the Nashville division of the Corps and the State of Tennessee Department of Environment and Conservation performed a joint wetlands delineation and investigated the site in August 1994. The subsequent delineation report, dated October 21, 1994, concluded that the approximately 39 acres of plaintiffs' property contained "25 acres of regulated wetlands" in two noncontiguous areas in the east and west of the property. Plaintiffs subsequently hired Thomas Heineke, Ph.D., a Certified Wetlands Scientist, to conduct his own field investigation. Dr. Heineke reviewed the delineation report and provided written comments objecting to the extent of the wetlands on the Robbins property, which he felt was "grossly exaggerated." Although Dr. Heineke asserted that "the fescue dominated portions of the site are not jurisdictional wetlands," he did not specify how much of the property did comprise wetlands, and plaintiffs do not challenge the Corps' wetland designation in their complaint.[3] The Corps responded to Dr. Heineke's objections by letter dated March 13, 1995, encouraging plaintiffs to submit a section 404 permit application to develop the property and noting that the "disturbed nature of the regulated wetlands on [the] property and the excellent on-site mitigation potential ... [were] conducive to the preparation of an environmentally acceptable and approvable development plan."

On December 13, 1995, the Headquarters of the Corps, Waterways Experiment Station, re-evaluated the prior wetlands delineation of the Corps Nashville District. The site investigation focused on the disputed area of the fescue field on the West side of the property. Plaintiffs' experts, Dr. Heineke and Eugene Lampley, were among those present during the investigation of the subject property. The Corps issued a re-evaluation report on January 8, 1996, concluding that the original wetland delineation report of October 12, 1994, was correct and that 25 of the 39 acres of plaintiffs' property comprised jurisdictional wetlands.

At no point have plaintiffs submitted a section 404 permit application to develop the wetlands. On December 12, 1996, plaintiffs filed their complaint in two counts to recover damages arising from the Corps' alleged taking of the land sale contract or, alternatively, the taking of the property without just compensation in violation of the Fifth Amendment.

2. While the parties stipulate that Mr. Lipps provided these estimates, he could not recall the details. The parties dispute the actual cost of developing the site, given the permitting requirements. Plaintiffs assert that defendant's estimate of $189,456.00 is a "gross exaggeration of the actual costs of developing the property."

3. Plaintiffs note, however, that there remain "serious questions regarding the extent to which such designation accurately reflects the existence of wetlands on the subject property." Plfs' Br. filed Aug. 18, 1997, at 1 n. 1. However, by pursuing a takings claim, plaintiffs "must concede the validity of the Government action which is the basis of the taking claim to bring suit under the Tucker Act." *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed.Cir.1993) (citing *Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 899 (Fed.Cir.1986)).

## DISCUSSION

### 1. *Summary judgment standards*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Summary judgment pursuant to RCFC 56 properly can intercede and prevent trial if the movant can demonstrate that trial would be useless in that additional evidence in connection with its motion could not reasonably be expected to change the result. *See Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984). In ruling on defendant's motion for summary judgment, the court is mindful of the precedents admonishing against "precipitous grants of summary judgment" in "fact-intensive" takings cases. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir.1983). However, the court has scrutinized the record to assure that no material facts are in dispute, that all presumptions and inferences are drawn in plaintiffs' favor, and that defendant has discharged its burden to establish entitlement to summary judgment as both a matter of fact and law.

### 2. *Takings issue*

■■■ Analyzing a takings claims involves a "two-tiered" inquiry into the governmental action resulting in a land use restriction. *M & J Coal Co. v. United States,* 47 F.3d 1148, 1153–54 (Fed.Cir.1995). First, a court should assess the nature of the land owner's private property interest in order to determine whether a compensable interest exists. *See id.* at 1154 (citing *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1027, 112 S.Ct. 2886, 2899, 120 L.Ed.2d 798 (1992)). Second, once the takings claimant has established the existence of a property interest,

the court must determine whether the governmental action at issue constitutes a compensable taking of private property for a public purpose. *See M & J Coal,* 47 F.3d at 1154. In making this latter determination, the court must engage in "'essentially ad hoc, factual inquiries.'" *MacDonald, Sommer & Frates v. County of Yolo,* 477 U.S. 340, 349, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986) (quoting *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979)). This inquiry considers three central factors: 1) the character of the government action or regulation; 2) the economic impact of the government action on the property owner; and 3) the extent of the interference with the owner's investment-backed expectations. *See Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 133, 98 S.Ct. 2646, 2663–64, 57 L.Ed.2d 631 (1978); *see also Kaiser Aetna,* 444 U.S. at 175, 100 S.Ct. at 390–91. Although both plaintiffs and defendant employ this three-prong analysis, they reach opposite conclusions.

Plaintiffs argue that the Corps' wetlands determination constitutes a government action resulting in a compensable taking of the land sale contract. In essence, plaintiffs assert that because the wetlands determination indirectly led to the cancellation of the land sales contract, the $351,000.00 in unrealized proceeds from the sale were "taken" and thus require compensation. Yet at oral argument on defendant's motion for summary judgment, plaintiffs' counsel seemed to argue that it was not the wetlands determination, rather, the wetlands delineation—finding that 25 of 39 acres comprised wetlands—that effectuated the taking of the contract.[4] The wetlands delineation occurred, however, five months after the contract was rescinded.

---

4. In the context of discussing the wetlands determination, plaintiffs' counsel then shifted his argument to the subsequent wetlands delineation:

> But in our case what happened after that [the wetlands determination] was the Government went beyond that. The Government then did a full-blown determination [delineation?]. Something that is very unique. If we would put on evidence, we would show that the Nashville office had never done a full-blown delineation before....

.... I am not asking the court to say that every time you have the Government come out and make a determination, it is a taking. We are not asking for that. We are not trying to change the law. We are just saying that under the unique set of facts of this case with that being the only obstacle to the sale going through, that under those set of circumstances, it can be deemed a taking of the contract. Transcript of Proceedings, *Robbins v. United States,* No. 96–779L, at 31–32 (Fed.Cl. Oct.27, 1997).

Thus, the issue is whether the wetlands determination effectuated a taking of the land sale contract. Plaintiffs alternatively contend that the wetlands determination and delineation constituted a compensable taking of the property itself, because defendant "has taken for public use substantially all beneficial and productive use of [p]laintiffs' land." Compl. filed Dec. 12, 1996, ¶¶ 22–26.

■ As a threshold issue, the parties dispute how the wetlands designation and subsequent cancellation of the land sale contract should be characterized—as a government action or a private action. Plaintiffs argue that, because the wetlands designation caused the cancellation of the land sales contract, it is a government action that effectuated a compensable taking. Defendant counters that the wetlands determination merely provided the impetus for the parties to cancel a private contract; hence, a private action, not a government action, is responsible for the non-realized proceeds, which plaintiffs claim were "taken."

That the parties dispute who actually canceled the contract—plaintiffs or Mr. Baker, the buyer—is immaterial. The fact remains that in no manner did the Corps preclude the sale of plaintiffs' property; the parties to the contract, not the Corps, caused the contract to fall though. Although the wetlands determination may have frustrated the land sale contract, it is well-settled that government action that merely frustrates expectations under a contract does not constitute a taking. *See 767 Third Avenue Associates v. United States,* 48 F.3d 1575, 1581 (Fed.Cir.1995) (citing *Omnia Commercial Co. v. United States,* 261 U.S. 502, 510–11, 43 S.Ct. 437, 438, 67 L.Ed. 773 (1923)); *see also NL Industries, Inc. v. United States,* 839 F.2d 1578, 1579 (Fed.Cir.1988) ("[F]rustration of a business by loss of a customer [is] not a taking."); *Kearney & Trecker Corp. v. United States,* 231 Ct.Cl. 571, 688 F.2d 780, 783 (1982) (finding no taking when the "[G]overnment did not appropriate any of the rights the plaintiff had under the contract but only made it impossible for the plaintiff to perform it").

■ For similar reasons, plaintiffs' alternative argument regarding the taking of the "commercial value" of the land also fails.

The fact that the wetlands determination may have prompted the recision of the land sale contract, or precluded a future contract with a similarly attractive price per acre, also is not material. The Corps has jurisdiction to issue a permit to fill jurisdictional wetlands pursuant to section 404. *See United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 126, 106 S.Ct. 455, 458–59, 88 L.Ed.2d 419 (1985). The wetlands designation itself cannot constitute a taking, as "it is quite clear that the mere assertion of regulatory jurisdiction by a governmental body does not constitute a taking." *Id.* at 126, 106 S.Ct. at 459 (citing *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 293–97, 101 S.Ct. 2352, 2369–71, 69 L.Ed.2d 1 (1981)). The wetlands designation does not preclude the sale or development of plaintiffs' property; rather, it merely precludes development without a permit. *See Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 800–01 (Fed.Cir.1993). Indeed, the possibility that the Corps may grant plaintiffs a permit precludes the wetland determination from constituting a taking. *See id.* at 801 (citing *Riverside Bayview,* 474 U.S. at 127, 106 S.Ct. at 459) (The permit requirement "does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted...."). The requisite government action is often supplied in takings cases when the Corps or other Government entity declines to grant a permit to an applicant to use its land in a particular way. That is not the case here, as plaintiffs have never applied for a section 404 permit.

The second prong of the takings inquiry focuses on the economic impact of the alleged government action, here the wetlands determination. *See Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659; *see also Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Plaintiffs assert that by designating as wetlands 25 of the 39 acres of plaintiffs' property, the Government "destroyed the commercial value of th[e] property." Plfs' Br. filed Aug. 18, 1997, at 15. The parties hotly dispute the fair market value of the property at the time of the wetlands designation. Plaintiffs argue that the fair

market value was $351,000.00—the value that Mr. Baker, the buyer, was willing to pay for the property. Defendant challenges this figure by pointing to the 1997 tax appraisal of the property for $65,600.00 and arguing that, absent an independent fair market value appraisal,[5] one could not conclude that the value of the property had actually declined.[6] Given the terrain and hydrology of the property, defendant argues, the property's value is probably far closer to the 1997 tax appraisal of $65,600.00 than the contract price of $351,000.00. Once again, the disputed issue of the amount to which the property's value diminished is not material, given that the purported economic impact—the loss of the contract proceeds or drop in the commercial value of the property—was not caused by government action, i.e., denial of a permit.

■■■ Assuming, arguendo, that the property's value did decrease, long-standing precedent nevertheless holds that the mere "diminution in a property's value, however serious, is insufficient to demonstrate a taking." Concrete Pipe and Products of Ca., Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 604, 113 S.Ct. 2264, 2270, 124 L.Ed.2d 539 (1993) (citing Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 384, 47 S.Ct. 114, 117, 71 L.Ed. 303, (1926)) (approximately 75% diminution in value due to zoning law). As the Supreme Court noted in Lucas, 505 U.S. at 1004, 112 S.Ct. at 2888, the economic impact factor may be dispositive if the regulation categorically deprives the claimant of "all economically viable use" of the property. Plaintiffs argue that the wetlands designation precludes them from maximizing the potential profit from selling the property. An inability to maximize profits, however, is insufficient to establish the deprivation of "all economically beneficial or productive use" of the property, as required for a compensable taking under Lucas, Id. But cf. Florida Rock Indus., Inc. v. United States, 18 F.3d 1560, 1570 (1994) (discussing "balancing of competing values" "when a partial loss of economic use of the property has crossed the line from a noncompensable 'mere diminution' to a compensable 'partial taking.' ")

■■■ The third factor of the takings inquiry is the extent to which the government action interferes with plaintiffs' reasonable investment-backed expectations. Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659; see also Keystone Bituminous Coal Ass'n v. De-Benedictis, 480 U.S. 470, 492, 107 S.Ct. 1232, 1245–46, 94 L.Ed.2d 472 (1987). Plaintiffs had originally purchased the property as an investment and insist that the Corps' wetlands determination and delineation interfered with their reasonable investment-backed expectations. Because the property "was not subject to frequent flooding or persistently wet condition" and because neighboring property had sold for "sums that greatly exceeded the canceled land sale contract price," Plfs' Br. filed Aug. 18, 1997, at 21, plaintiffs argue that they reasonably could have expected that their land would have the same value. They point to the commercial development of the adjoining neighbor's property as further evidence of the reasonableness of their expectations. However, that these expectations were reasonable is unclear; they existed without the knowledge that 25 of the 39 acres of the property, including acreage that abutted the highway, comprised jurisdictional wetlands.

In Penn Central the Supreme Court rejected, as "quite simply untenable" the argument that property owners "may establish a 'taking' simply by showing that they have

---

5. Plaintiffs have provided three virtually identical affidavits that purport to demonstrate the fair market value of the property. The affidavits state that "the Robbins' property was extremely marketable and the $351,000.00 sale price was certainly reasonable." Affidavit of William M. Johnson, Aug. 7, 1997, ¶ 7; Affidavit of Samuel R. Striker, Aug. 7, 1997, ¶ 7; Affidavit of Harold Bass Jr., Aug. 8, 1997, ¶ 7. Only one of the affiants is a certified appraiser, and none of the affidavits reflects an independent appraisal of the fair market value of the property.

6. As defendant notes, plaintiffs purchased the property in 1975 for $36,000.00; in 1994 the appraised value of the property was $65,100.00, and in 1997 the appraised value was $65,600.00. Although the value of the property as set by tax appraisal is not equivalent to the fair market value, it is open to dispute what the fair market value of the property was before and after the alleged taking occurred.

been denied the ability to exploit a property interest that they heretofore had believed was available for development...." 438 U.S. at 130, 98 S.Ct. at 2662; *see also Deltona Corp. v. United States*, 228 Ct.Cl. 476, 491, 657 F.2d 1184, 1193 (1981) (finding that denial of highest economic use of property "does not form a sufficient predicate for a taking."). Plaintiffs' taking claim unfortunately amounts to little more and does not establish the requisite elements for a compensable taking.

### 3. *Ripeness of plaintiffs' claims*

The ripeness doctrine functions to prevent courts "from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Defendant contends that this case is not ripe because plaintiffs have not sought a permit under section 404 of the Clean Water Act. Federal Water Pollution Control Act Amendments of 1972, § 404, *as amended*, 33 U.S.C. § 1344 (1994).

Plaintiffs acknowledge the general rule regarding the ripeness of a takings claim: "[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 105 S.Ct. 3108, 3117, 87 L.Ed.2d 126 (1985); *see also MacDonald, Sommer & Frates*, 477 U.S. at 349, 106 S.Ct. at 2566. Only when a section 404 permit is applied for, denied, and prevents " 'economically viable' use of the land in question" can there be a taking. *Riverside Bayview*, 474 U.S. at 127, 106 S.Ct. at 459.

To date plaintiffs have declined to seek a section 404 permit; they assert that exhausting the section 404 permitting process would be "futile" for two reasons, and therefore is not required before they can bring a takings claim. First, they argue that the taking occurred at the time of the wetlands designation and the subsequent cancellation of the land sale contract, so at that point the takings claims ripened. Therefore, plaintiffs contend, "[a]n after the fact § 404 permit application would in no way serve to clarify the extent to which the regulatory action interfered with [p]laintiffs' property rights." Plfs' Br. filed Aug. 18, 1997, at 24. To the extent that the genesis of plaintiffs' takings claim allegedly occurred at the time of the wetlands determination, the issue presents a controversy ripe for review.

Second, plaintiffs contend that the permit application process, particularly the allegedly expensive mitigation requirements, would be "unduly burdensome" and thus futile. Plfs' Br. filed Aug. 18, 1997, at 25. Although plaintiffs cite several cases to support the contention that resorting to the section 404 permit process would be futile, they are distinguishable. For example, in *Broadwater Farms Joint Venture v. United States*, 35 Fed.Cl. 232, 235 (1996), plaintiff began improvements to its property without a permit until the Corps ordered a complete and immediate restoration of the property to its natural wetlands condition. The court found that "[n]o reasonable landowner would find a 'door left open' for obtaining a permit [under] the circumstances of this case" and that the "Corps would not allow development." *Id.* at 237; *see also MacDonald, Sommer & Frates*, 477 U.S. at 352, 106 S.Ct. at 2568 (noting takings question in doubt because of the "possibility that some development will be permitted"). The Corps has manifested an apparent willingness in the instant case to work with plaintiffs to prepare a development plan and to secure a section 404 permit.[7]

7. Keith Wade Whittinghill, the Corps Regulatory Project Manager in charge of the wetlands determination of plaintiffs' property, avers:

> I explained the Corps of Engineers' permit application process to Mrs. Robbins in detail and I assured her that the Corps would gladly assist her in any way should she decide to apply for a permit. I also informed Mrs. Robbins that, while we could not guarantee what the final decision would be on any permit

Plaintiffs place greater emphasis on what they term an " 'economic futility' argument." Plfs' Br. filed Oct. 7, 1997, at 2. Plaintiffs cite *Hage v. United States,* 35 Fed.Cl. 147, 164 (1996), for the proposition that they need not exhaust the section 404 permitting process if the procedure "is so burdensome that it effectively deprives the property of value." Not only is *Hage* distinguishable, but this quotation omits another factor involved in showing futility[8] and does not contemplate speculation as to the expense of the permitting process.

Plaintiffs assert that in order to "retain the commercial value of the property" a permit must be sought to fill the entire 25 acres of wetlands "to clear the taint of the wetlands designation on the entire parcel." Plfs' Br. filed Oct. 7, 1997, at 3–4. Attempting to explain the economic futility of on-site mitigation, plaintiffs present a conservative hypothetical indicating that even assuming a one-to-one acre exchange,[9] the cost of mitigation could exceed the land sale contract by $11,-000.00. *Id.* at 4. Plaintiffs' hypotheticals aside, the cost of determining and fulfilling an acceptable mitigation plan under the Corps' mitigation guidelines is completely speculative.[10] Without a section 404 permit, one cannot know whether, as plaintiffs contend, the cost of mitigation would be "eco-

nomically impractical," or would, in fact, be akin to a permit denial.

As the Federal Circuit recently expounded, "the futility exception simply serves 'to protect property owners from being required to submit multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved.' " *Howard W. Heck, and Assocs., Inc. v. United States,* 134 F.3d 1468, 1472 (Fed.Cir.1998) (quoting *Southern Pac. Transp. Co. v. City of Los Angeles,* 922 F.2d 498, 504 (9th Cir.1990)). In the case at bar, plaintiffs have not demonstrated this type of futility, and their speculative economic futility arguments enjoy little legal support.

Therefore, plaintiffs' takings claim—pinning the taking to the wetlands determination—is ripe for review, whereas a takings claim based on a denial of a section 404 permit is obviously not ripe, but would be in the future if plaintiffs apply for, and are denied, a section 404 permit.

While the court is sympathetic to plaintiffs' plight, it cannot disregard existing precedents and invent new law. The wetlands determination and delineation themselves are insufficient to constitute a compensable taking, as they do not supply the requisite government action required by *Penn Central* and its progeny. While it may be true that

application, she had a situation lending itself to the preparation of a development plan which would be environmentally acceptable and approvable by the Corps given the disturbed nature of the wetlands on the property and the excellent on-site mitigation potential. Affidavit of Keith Wade Whittinghill, Sept. 9, 1997, ¶ 3. Mrs. Robbins states that "Mr. Whittinghill mentioned mitigation but *never* gave me specific information.... Mr. Whittinghill made it clear on numerous occasions that there was no guarantee that a permit would be issued for my property in the event that I did apply." Affidavit of Nancy A. Robbins, Oct. 3, 1997, ¶ 6. This is not akin to denying a permit application, contrary to plaintiffs' intimation during oral argument.

**8.** *Hage* cites two factors involved in a showing of futility: "[T]he law does not require plaintiffs to apply for a permit if the procedure itself is not a reasonable procedure, and is so burdensome that it effectively deprives the property of value." 35 Fed.Cl. at 164 (citations omitted).

**9.** The Corps' mitigation policy under section 404 is set forth in the Memorandum of Agreement Between the Environmental Protection Agency

and the Department of the Army Concerning the Determination of Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines (Feb. 7, 1990) (the "MOA"). In keeping with a policy of no net loss of wetlands, the Corps will generally require that at least 1 acre of wetlands be created for every 1 acre that is filled. However, the MOA also states that "the ratio may be less than 1 to 1 for areas where the ... likelihood of success associated with the mitigation proposal is high." MOA at 6.

**10.** Under the plaintiffs' hypothetical and a one-for-one acreage exchange, plaintiffs would need to purchase eleven acres, so that when added to the 14 nonwetland acres of their property, the resulting 25 acres equals the 25 acres of wetlands which will be filled. The hypothetical, however, assumes a purchase price of $10,-000.00 per acre, which may be inflated given that the Robbins' land and buildings were to be sold for $9,000.00 an acre and they were in a commercially desirable location abutting a highway.

the wetlands determination directly or indirectly caused the land sale to fall through, this was a private, not a government action. Plaintiffs may continue to use their property as they always have, but in order to fill the wetlands they must seek a section 404 permit with the Corps. If, however, the Corps denies plaintiffs a section 404 permit, a final action, then plaintiffs have an entirely different case, for then they can demonstrate the requisite government action. The Corps has expressed its willingness to assist plaintiffs with the permitting process, and the court has no reason to believe that such assistance will not be forthcoming.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion for summary judgment is granted. The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**

No costs.